# Exhibit G

**(Immediately Follows This Page)**

# BUILDING LOAN AGREEMENT

### in the amount of up to $35,500,000.00

### Between

## 4452 BROADWAY MAZAL LLC

### and

## 4452 BROADWAY 1 LLC

### Dated as of: January 23, 2019

**Property Address:**

**4452 Broadway**
**New York, New York 10040**
**Block:**      **2170**
**Lots:**      **62 & 400**
**County:**      **New York**
**State:**      **New York**

## DOCUMENT PREPARED BY AND WHEN FILED, RETURN TO:

**4452 BROADWAY 1 LLC**
**c/o Madison Realty Capital**
**825 Third Avenue, 37th Floor**
**New York, New York 10022**
**Attention: Shoshana Carmel**

## BUILDING LOAN AGREEMENT

THIS BUILDING LOAN AGREEMENT ("**Agreement**") dated as of the 23rd day of January, 2019, from **4452 BROADWAY MAZAL LLC**, a Delaware limited liability company, having an address at c/o HAP Investments LLC, 3 East 54th Street, 15th Floor, New York, New York 10022 ("**Borrower**"), and **4452 BROADWAY 1 LLC**, a Delaware limited liability company, its successors and/or assigns, as their interests may appear, having offices at 825 Third Avenue, 37th Floor, New York, New York 10022 ("**Lender**").

## W I T N E S S E T H:

WHEREAS, subject to and upon the terms and conditions hereinafter set forth, Borrower wishes to borrow from Lender and Lender is willing to lend to Borrower, amounts up to but not exceeding THIRTY FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($35,500,000.00) in the aggregate.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Use of or reference to the following terms herein shall be construed as indicated below. All other capitalized terms used but not otherwise defined in this Article I shall have the meanings ascribed to such terms in this Agreement, the Building Loan Mortgage or the Building Loan Note:

1.1    Advance: Any disbursement of a portion of the Building Loan by Lender pursuant to the terms hereof.

1.2    Architect: Fischer & Makooi Architects PLLC or such architect as approved by Lender in its sole but commercially reasonable discretion.

1.3    Architect's Agreement: That certain AIA Document B101-2007 Standard Form of Agreement between Owner and Architect dated as of September 19, 2018 between Borrower and the Architect, as the same may be amended, restated, extended or otherwise modified from time to time in accordance with this Agreement or as otherwise approved by Lender in its reasonable discretion.

1.4    Budget: Borrower's estimate of the cost to complete the Improvements, which estimate has been delivered to Lender and is attached to that certain Certification of Budget executed by Borrower and dated as of the date herewith, as the same may be revised from time to time in accordance with the terms of this Agreement.

1

1.5    <u>Budgeted Amount</u>: The portion of the Building Loan that Borrower expects to be advanced for any particular line item of Hard Costs, as set forth in the Budget.

1.6    <u>Building Loan</u>: Up to THIRTY FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($35,500,000.00) in the aggregate, or so much thereof as may be advanced by Lender pursuant to the terms and conditions of this Agreement.

1.7    <u>Building Loan Mortgage</u>: The Building Mortgage and Security Agreement dated the date hereof, that has been executed and delivered by Borrower to Lender, which encumbers the Property and the Improvements and secures, among other things, Borrower's obligations under the Building Loan Note and under this Agreement.

1.8    <u>Building Loan Note</u>: The Building Loan Note in the original principal amount of up to THIRTY FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($35,500,000.00), dated the date hereof, that has been executed and delivered by Borrower in favor of Lender and which evidences the Building Loan.

1.9    <u>Building Loan Term</u>: The period of time commencing on the date hereof and ending on the Maturity Date, as defined in the Building Loan Note, subject to extension pursuant to the terms of the Building Loan Note.

1.10    <u>Business Day</u>: Any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

1.11    <u>Collateral Documents</u>: The Building Loan Mortgage; the Assignment of Leases and Rents, dated as of the date hereof, executed by Borrower in favor of Lender ("**Assignment**"); any Uniform Commercial Code financing statements filed in connection with the Building Loan Mortgage and/or the Assignment; the Environmental Indemnity Agreement dated the date hereof, executed by Guarantor in favor of Lender, and the Guaranty of Completion, the Conditional Guaranty and the Debt Service and Carry Guaranty, each dated the date hereof and executed by Guarantor in favor of Lender (the Environmental Indemnity Agreement, the Guaranty of Completion, the Conditional Guaranty, and the Debt Service and Carry Guaranty are hereinafter referred to, collectively, as the "**Guaranty**"); and any and all other loan documents executed by the Borrower for the benefit of Lender in connection with the Building Loan.

1.12    <u>Construction Manager</u>: Such general contractor or construction manager as approved by Lender in its reasonable discretion.

1.13    <u>Construction Work</u>: The construction of the Project, which is to be carried out by Borrower using the proceeds of the Building Loan and Borrower's funds in compliance with the Budget.

1.14    <u>Environmental Laws</u>: This term has the meaning ascribed thereto in that certain Environmental Indemnity Agreement executed by Borrower and Guarantor of even date herewith, in favor of Lender.

2

1.15    Funding Date:  The date on which an Advance is actually disbursed.

1.16    Guarantor:  Collectively, AMIR HASID and NIR AMSEL, pursuant to the Guaranty.

1.17    Hard Costs:  The costs of labor, materials, equipment, as well as any other costs which are not Soft Costs (as defined below) and which are "costs of an improvement" (as such term is defined in Section 2(5) of the New York Lien Law), in connection with the completion of the Construction Work as set forth and itemized in the Budget.

1.18    Improvements:  All structures, and buildings and all replacements thereof, now or hereafter located or erected upon the Property including all personal property owned by Borrower of every kind and nature whatsoever affixed to or forming part of said structures and/or buildings.

1.19    Intentionally Deleted.

1.20    Land Loan: The loan made pursuant to that certain Consolidated, Amended and Restated Note, that certain Consolidated, Amended and Restated Mortgage and Security Agreement (the "**Land Loan Mortgage**"), and all underlying loan documents in the original principal balance of $10,000,000.00, dated of even date herewith, between the Lender and the Borrower, secured by, *inter alia*, a first (1st) lien against the Property, as the same may hereafter be modified, amended, renewed or extended.

1.21    Lender's Consultant: The appointed construction consultant of Lender.

1.22    Legal Requirements:  All laws, statutes, treaties, codes, permits, decrees, ordinances, orders, rules, regulations, determinations, or requirements of any governmental authority, arbiter or court, including, without limitation, any Environmental Laws, any building, use, zoning and land use laws or regulations (including set back requirements), and any applicable covenants and restrictions pursuant thereto.

1.23    Loan Amount:  Up to THIRTY FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($35,500,000.00) in the aggregate.

1.24    Mezzanine Loan:  The loan made pursuant to that certain Mezzanine Promissory Note, that certain Mezzanine Loan Agreement, that certain Ownership Interests Pledge and Security Agreement, and all underlying loan documents in the original principal balance of $4,000,000.00 dated of even date herewith, between **4452 BROADWAY 2 LLC** ("**Mezzanine Loan Lender**"), as lender, and the Borrower's sole member **4452 BROADWAY MAZAL SENIOR MEZZANINE LLC**, a Delaware limited liability company ("**Mezzanine Loan Borrower**"), as borrower, secured by, *inter alia*, a first (1st) lien encumbering Mezzanine Loan Borrower's ownership interest in Borrower, as the same may hereafter be modified, amended, renewed or extended.

1.25    Net Building Loan: The aggregate of all Hard Costs.

3

1.26    Intentionally Omitted.

1.27    Project:  The Property together with the Improvements.

1.28    Project Loan: The project loan made pursuant to that certain Project Loan Note, that certain Project Mortgage and Security Agreement (the "**Project Loan Mortgage**"), and all underlying loan documents in the original principal balance of up to $3,000,000.00, dated of even date herewith, between Lender and the Borrower, secured by, *inter alia*, a third (3rd) lien against the Property, as the same may hereafter be modified, amended, renewed or extended.

1.29    Property: Collectively, the premises located at 4452 Broadway, New York, New York 10040, as more particularly described on Schedule A attached hereto and made a part hereof.

1.30    Requisition:  A written certification and request for an Advance signed by Borrower substantially in the form of Schedule C attached hereto.

1.31    Retainage:  With respect to any construction contract for Hard Costs for Construction Work, ten Percent (10%) of the sum of such contract actually incurred by Borrower for work in place as part of the Improvements until such time as seventy-four percent (75%) of the Project is complete, and thereafter five percent (5%); in each case as reasonably determined by Lender from time to time which amount shall be released upon delivery of a permanent certificate of occupancy (other than with respect to a retail unit where a certificate of occupancy may not have been obtained); provided, however, the Retainage being held with respect to any contractor, subcontractor or materialman shall be released after Lender's Consultant certifies to Lender that such contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of such contractor's, subcontractor's or materialman's contract.

1.32    Scheduled Completion Date:  The date that is two (2) months prior to the Initial Maturity Date, as contained in the Building Loan Note; provided, however, that in the event the Borrower extends the Loan in accordance with this Agreement, the Scheduled Completion Date may be extended for up to six (6) months after the Initial Maturity Date (i) for Force Majeure or (ii) if Construction Work is not yet complete but is progressing to the reasonable satisfaction of Lender's Consultant.  For purposes of this Agreement, "*Force Majeure*" shall mean Acts of God (including fire, flood, earthquake, storm, hurricane or other natural disaster), war, invasion, act of foreign enemies, hostilities (regardless of whether war is declared), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity or telephone service.

1.33    Soft Costs:  The costs relating to the Project or the Building Loan, which are not "costs of an improvement" (as such term is defined in Section 2(5) of the New York Lien Law), including but not limited to, Borrower's legal fees and costs, marketing expenses, and leasing and brokerage commissions, as itemized in the Budget. ***NO SOFT COSTS WILL BE***

4

***ADVANCED UNDER THIS BUILDING LOAN.***

1.34    Title Company: Gotham Abstract & Settlment, LLC and World Wide Land Transfer, as agents for Fidelity National Title Insurance Company; *provided, however*, that Gotham Abstract & Settlement, LLC shall serve as lead Title Company for all purposes under the Loan Documents.

1.35    Title Policy: The title insurance commitment, marked and re-dated as of the date hereof, that has been issued by the Title Company insuring the second (2nd) mortgage lien of the Building Loan Mortgage (subordinate only to the liens of the Land Loan Mortgage, as hereinafter defined), as the same shall be updated from time to time in accordance with the pending disbursements endorsement that is included therein.

Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, and (iv) the word "including" means "including but not limited to".

## ARTICLE II

## BUILDING LOAN ADVANCES

2.1    Agreement to Lend: Subject to the terms and conditions of this Agreement and Borrower's compliance with all the provisions hereof, and relying on Borrower's representations set forth herein, Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, an amount not to exceed the Loan Amount, to be disbursed in several Advances at such times and in such amounts as Lender shall determine in accordance with the procedures set forth in this Agreement. Notwithstanding anything to the contrary provided for herein, no Advances shall be made hereunder until such time as the Mezzanine Loan is fully funded.

2.2    Advances Generally.

(a)    Subject to the terms and conditions of this Agreement, each Advance shall be in an amount determined by Lender to be equal to the total Hard Costs incurred or paid for by the Borrower (subject to Section 2.2(m)) and then due through the end of the period covered by the applicable Requisition less the aggregate amount of Advances previously made.

(b)    Lender may withhold from each Advance an amount equal to the Retainage with respect to the Hard Costs to be included in any such Advance, to the extent provided in the definition of Retainage in 1.31 hereof. All Retainage shall be advanced in the Final Advance provided the conditions obligating Lender to make the Final Advance shall have occurred; provided, however that Retainage for any individual contract shall be Advanced at the time that the work under such contract is complete to the reasonable satisfaction of Lender's Consultant and the applicable contractor has provided a final lien waiver for all payments received

5

by it to date and a conditional lien waiver covering the final payments to be made to such contractor. Lender, in its sole and absolute discretion, reserves the right to release to Borrower all or any portion of the Retainage at any time during the Building Loan Term (and any such release shall be considered an Advance for the purposes of subsections 2.2(a) and 2.2(d)). To the extent Lender does not withhold Retainage from any Advance, Lender reserves the right to require Retainage to be withheld from future Advances in accordance with the terms hereof.

(c)    Lender shall not be required to make an Advance more than once in any thirty (30) day period, and no Advance shall be for an amount less than $100,000.00.

(d)    Intentionally omitted.

(e)    Lender shall not be required to make any Advance other than to pay for, or to reimburse to Borrower for amounts paid for, those line items of Hard Costs set forth in the Budget ("**Line Item**"). Subject to Borrower's right to allocate and reallocate as provided below, Lender shall not be required to make any Advance for any Line Item that would cause the aggregate amount advanced for such Line Item to exceed the Budgeted Amount for such Line Item. Lender shall not be required to make any Advance that would reduce the undisbursed portion of any Line Item below an amount that Lender (or Lender's Consultant) determines is the amount of such Line Item that is necessary to complete the Construction Work. Lender further reserves the right to require that Borrower deposit with Lender, within ten (10) days of Lender's demand therefor, good and readily available funds equal to the amount that Lender (or Lender's Consultant) determines is in excess of the Budget amount of such Line Item that is necessary to complete the Construction Work and the undisbursed portion of such Line Item ("**Line Item Deficiency Amount**") Notwithstanding the foregoing, Borrower shall be entitled to (i) reallocate actual demonstrated cost savings from a line item to the contingency line item, which reallocated amount shall then be treated as, and subject to the requirements of, contingency funds for all purposes of this Agreement and (ii) reallocate funds from the contingency line item so long as the contingency line item exceeds five percent (5%) of the remaining cost to complete the Project; provided, however, that once one hundred percent (100%) of all trades are bought out and the Project is seventy-five percent (75%) complete, contingency must exceed three percent (3%) of the remaining cost to complete the Project.

(f)    Lender shall not be required to make Advances for building materials that have not been incorporated into the Improvements, unless: (i) at Lender's election, the Lender's Consultant shall have inspected such materials and found them to be of acceptable quality and in conformance with the Budget; (ii) Borrower shall have delivered to Lender bills of sale or other evidence reasonably satisfactory to Lender of the cost of, and Borrower's title to, such materials; (iii) Borrower shall have delivered evidence reasonably satisfactory to Lender specifying (1) the security measures that have been taken to protect such materials from theft, casualty or deterioration, and (2) the steps that have been taken to identify and to segregate such materials so as adequately to give notice to all third parties of Borrower's title in and to such materials; (iv) Borrower shall have provided evidence reasonably satisfactory to Lender that such materials are insured against all risk of loss for their full replacement cost; (v) such materials shall be stored on the Property or another secure site within the United States; and (vi) to the extent that Advances with respect to materials that are stored offsite and have not been incorporated in the

Improvements shall at any one time exceed Three Million Dollars ($3,000,000), Lender shall have received UCC-1 financing statements or other evidence reasonably satisfactory to Lender of Lender's perfected second (2nd) priority lien on and security interest in such materials (subordinate only to the lien of the Land Loan Mortgage). In addition to the foregoing, Borrower and Lender hereby agree that Lender shall only be required to make any such Advances for building materials that have not been incorporated into the Improvements (to the extent Lender is otherwise required to do so) in accordance with the schedule attached to a separate agreement between Lender and Borrower (the "**Stored Materials Schedule**"). Borrower and Lender agree that on or prior to the Subsequent Construction Deadline Date, they shall together reevaluate the Stored Materials Schedule, and make any changes reasonably necessary thereto to in order to better account for the amount of materials actually being stored pursuant to the trade contracts executed prior to the Subsequent Construction Deadline Date, provided, however the amount of stored materials for which Lender shall make Advances hereunder may not at any time exceed fifty percent (50%) of the total amount of the applicable contract.

(g)       Regardless of whether Borrower has submitted a Requisition therefor, Lender, in its sole and absolute discretion, may, from time to time, advance amounts that become due for Hard Costs for which Borrower is then responsible for payment due provided that Borrower has not paid same within ten (10) Business Days of receipt of notice from Lender. Such advances may be made directly to (i) parties to whom such amounts are due, or (ii) Lender to reimburse Lender for sums due to it. All such advances ("**Direct Advances**") shall be deemed Advances hereunder and shall be secured by the Collateral Documents to the same extent as if they were made directly to Borrower.

(h)       All Advances, other than Direct Advances, shall be made to Borrower's account at an account established at (x) JPMorgan Chase or (ii) another bank as shall be approved by Lender in its sole but commercially reasonable discretion (the "**Bank**").

(i)       If Lender, Lender's Consultant or Title Company shall so require, Borrower shall submit with its Requisitions estoppel certificates, lien waivers or other similar certifications in form reasonably satisfactory to Lender and Title Company showing amounts paid and amounts due to all persons or organizations furnishing labor or materials in connection with the completion of the Improvements.

(j)       The making of an Advance by Lender shall not constitute Lender's approval or acceptance of the construction theretofore completed. Lender's inspection and approval of the Budget, the Construction Work, the Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Lender, the sole obligation of Lender as the result of such inspection and approval being to make the Advances if, and to the extent, required by this Agreement. Any disbursement made by Lender without Lender having received each of the items to which it is entitled under this Agreement shall not constitute breach or modification of this Agreement, nor shall any written amendment to this Agreement be required as a result thereof.

(k)       ALL POTENTIAL LIENORS ARE HEREBY CAUTIONED TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO

BORROWER.    NO POTENTIAL LIENOR SHOULD EXPECT LENDER TO MAKE
ADVANCES OF THE BUILDING LOAN IN AMOUNTS AND AT TIMES SUCH THAT IT
WILL NOT BE NECESSARY FOR EACH SUCH POTENTIAL LIENOR TO EXERCISE
SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER.
MOREOVER, ALL POTENTIAL LIENORS ARE REMINDED THAT SUBDIVISION (3) OF
SECTION 13 OF THE NEW YORK LIEN LAW PROVIDES THAT "NOTHING IN THIS
SUBDIVISION SHALL BE CONSIDERED AS IMPOSING UPON THE LENDER ANY
OBLIGATION TO SEE THE PROPER APPLICATION OF SUCH ADVANCES BY THE
OWNER," AND LENDER HAS NO INTENTION OF VOLUNTARILY IMPOSING SUCH
OBLIGATION ON ITSELF.

(l)    If at any time the undisbursed balance of a Line Item is, in Lender's
judgment, excessive, the excess may be reallocated to any other Line Item balance which Lender
deems to be insufficient.

(m)    Loan Balancing.  Notwithstanding anything contained herein to the
contrary, if at any time Lender notifies Borrower that, in Lender's sole but reasonable judgment,
the undisbursed balance of the Building Loan is insufficient to pay the remaining Hard Costs and
Deferred Origination Fee, Borrower shall within twenty (20) days of Lender's notification as
aforesaid, deposit with Lender an amount equal to such deficiency (the "**Building Loan
Deficiency Amount**"), which, so long as no Event of Default exists, Borrower may from time to
time apply in strict accordance with the Budget, and otherwise Lender may apply, to such costs.
Borrower hereby agrees that Lender shall have a lien on and security interest in any sums deposited
pursuant this Section (m) and that Borrower shall have no right to withdraw any such sums except
for the payment of the aforesaid costs and fees as approved by Lender.  Lender shall have no
obligation to make any further Advances of proceeds of the Building Loan until the sums required
to be deposited pursuant this Section (m) have been exhausted, and, the Building Loan is back "in
balance".  Any such sums not used as provided in this Section (m) shall be released to Borrower
when and to the extent that Lender reasonably determines that the amount thereof is more than the
excess, if any, of the sum of the Deferred Origination Fee and the total remaining Hard Costs of
completion of the Improvements over the undisbursed balance of the Building Loan, provided,
however, that should an Event of Default occur, Lender may, at its option, apply such amounts
either to the Deferred Origination Fee, to the costs of completion of the Improvements or to the
immediate reduction of outstanding principal and/or interest under the Building Loan Note.

(n)    Lender shall have absolutely no obligation to make any Advances
after the Scheduled Completion Date.  Borrower shall indemnify Lender, and hold Lender
harmless from, any liability or claim of any nature whatsoever that arises from Lender's due right
under this Agreement to discontinue Advances following the Scheduled Completion Date.

(o)    Advances of the Building Loan are to be applied solely to Hard
Costs in accordance with the Budget.  Lender shall have no obligation to permit use of proceeds
of the Building Loan for any other purpose.

(p)    Lender shall not be required to make any Advances to fund any
deposit due in connection with any construction contract for Hard Costs other than those

8

referenced on <u>Schedule B</u> attached hereto and made a part hereof, for which Advances shall be made in accordance with and subject to the terms hereof. Notwithstanding the foregoing, in the event any of the aforementioned construction contracts signed by Borrower ultimately require less of a deposit than the amount set forth on <u>Schedule B</u>, Lender shall only be required to make an Advance for the amount of the deposit actually required pursuant to said construction contract. Lender shall not be required to make Advances to reimburse Borrower for any funds previously expended by Borrower to fund any deposit due in connection with any construction contract for Hard Costs.

> 2.3  <u>Certain Conditions Precedent to Lender's Obligation to Make Advances of the Building Loan</u>: Lender shall not be obligated to make any Advance unless all of the following conditions shall be satisfied as of the proposed Funding Date of such Advance:

> (a)  Lender and Lender's Consultant shall have each received a Requisition from Borrower, at least ten (10) Business Days prior to the proposed Funding Date, together with (i) paid receipts (including invoices, bills and copies of payments made in connection therewith) and lien waivers for all Hard Costs and Soft Costs that were included in any prior Advances and invoices for all Hard Costs proposed to be included in the applicable Advance and (ii) an application and certificate for payment (AIA G702) signed by the Architect and Construction Manager, along with a completed continuation sheet (AIA G703).

> (b)  If payment or reimbursement is being requested for any Hard Costs, or any fees of architects and engineers, or construction management fees, Lender shall have received a written statement from Lender's Consultant, at least five (5) Business Days prior to the proposed Funding Date, certifying to Lender (i) the amount of Hard Costs (broken down by Line Item) and the amount of any fees of architects and engineers, or construction management fees, that have been incurred by Borrower, (ii) the estimated total Hard Costs (broken down by Line Item) necessary to complete the Construction Work in accordance with the Budget, (iii) whether all municipal governmental agency inspections that should have occurred with respect to the completed construction have occurred, and (iv) whether the completed construction has been performed in a good and workman like manner and in accordance with the Budget. Lender agrees that obtaining such report is the responsibility of Lender, but that Borrower shall reasonably cooperate with Lender's Consultant, including with respect to a site visit.

> (c)  At Borrower's sole cost and expense, Lender shall have received an endorsement to or continuation of the Title Policy pursuant to the pending disbursements clause thereof, changing the date of the Title Policy to the applicable Funding Date, insuring that there has been no change in the state of title to the Property since the previous Advance, other than changes permitted under the Loan Documents, and that the Building Loan Mortgage remains a second (2nd) lien encumbering the Project (subordinate only to the lien of the Land Loan Mortgage and other liens permitted hereby, including Permitted Exceptions), and increasing the coverage of the Title Policy to include the amount of the applicable Advance.

> (d)  Lender shall not have received evidence that there are any conditional sales contracts, chattel mortgages, leases of personality, financing statements or title retention agreements affecting any of the Mortgaged Property (as such term is defined in the Building Loan Mortgage).

(e)      Each of the representations and warranties contained in this Agreement shall be true and correct as of the proposed Funding Date (unless such are made only as of a specific date), as reasonably determined by Lender.

(f)      No Event of Default shall have occurred and be continuing and no event that with the passage of time or notice, or both, would constitute an Event of Default shall have occurred or be continuing.

(g)      Borrower shall have paid to Lender all fees and expenses required to be paid by Borrower under this Agreement, including, without limitation, an administration fee in the amount of $4,000 per Requisition (the "**Administration Fee**", and Lender's Consultant's fee in the amount of $5,000 per Requisition (the "**Consultant Fee**"). For the avoidance of doubt, neither the Administration Fee nor the Consultant Fee shall be due and payable unless and until construction commences on the Project and the General Contract has been signed and delivered.

(h)      Intentionally omitted.

(i)      Borrower shall provide evidence to Lender that the proceeds of the most recent previous Advance hereunder have been applied to the payment of Hard Costs, and otherwise to construct the Improvements, subject to Lender's confirmation and approval in its sole but reasonable discretion.

(j)      Special Condition Precedent to Lender's Obligation to Make the first Advance: In addition to the terms and conditions set forth in Section 2.2 and this Section 2.3 hereof and elsewhere in this Agreement, prior to the first Advance hereunder, Borrower shall provide evidence to Lender that: (1) Borrower has obtained all permits and approvals in accordance with applicable Legal Requirements from the applicable municipal authorities as are necessary to commence and complete the Construction Work, as confirmed by Lender in its sole but commercially reasonable discretion; (2) the Property has been completely vacated from all tenants and occupancies in accordance with applicable Legal Requirements, as evidenced by written surrender agreements and inspection by Lender and/or Lender's Consultant, the sufficiency of such evidence being subject to Lender's approval in its sole but reasonable discretion; (3) all proceeds of the Land Loan have been applied to purchase the Property or to Hard Costs, and otherwise to construct the Improvements, subject to Lender's confirmation and approval in its sole discretion, (4) Borrower and Construction Manager shall have entered into the guaranteed maximum price General Contract (the "**General Contract**"), which General Contract shall be in form in substance acceptable to Lender, (5) Borrower and Construction Manager shall have entered into an Assignment and Subordination of Construction Contract in the form attached hereto as Schedule E, (6) Borrower and Architect shall have entered into the Architect's Agreement, which Architect's Agreement shall be acceptable to Lender, (7) Architect shall have executed a Will-Serve Letter in the form attached hereto as Schedule F, (8) Borrower and/or Construction Manager shall have bought out no less than fifty percent (50%) of all trades doing work at the Property (the "**Initial Required Contractor Buyout**"), (9) Borrower have deposited with Lender the Borrower Equity Requirement (as defined in Section 2.5(a) hereof), (10) Lender and Lender's Consultant shall have re-reviewed and re-approved the Budget, and in the event that any

reallocations as between Hard Costs and Soft Costs from the Budget provided as of the closing of the Loan are deemed necessary or advisable by Lender or Lender's Consultant or required pursuant to applicable law, (A) Borrower shall have executed such loan or other documents (including, without limitation, a new Lien Law Statement) as are necessary in Lender's determination to reflect such required reallocations and (B) Borrower shall have purchased, at Borrower's sole cost and expense, such new Title Policies as may be required by Lender in its sole but reasonable discretion to continue to insure Lender's interests as a result of such reallocations.

2.4    <u>Special Conditions Precedent to Lender's Obligation to Make the Final Advance</u>: Without limiting the generality of the foregoing, Lender shall not be obligated to make the final Advance ("**Final Advance**"), unless, in addition to the terms and conditions set forth in Section 2.2 and 2.3 hereof and elsewhere in this Agreement, the additional following conditions shall be satisfied as of the proposed Funding Date for the Final Advance:

(a)    Lender and Lender's Consultant shall have received a completed AIA Form G704 signed by the Architect, Construction Manager, and Borrower evidencing that the Construction Work has been substantially completed, subject to punch list items;

(b)    Lender shall have received one or more temporary or permanent certificates of occupancy for the Project issued by the municipal body or agency having the authority to do so, all other permits and licenses necessary for occupancy and use of the Project (other than with respect to a retail unit for which a certificate of occupancy may not yet have been issued), on or prior to the Scheduled Completion Date, and there must be no material violations of the City, State or Federal Government encumbering the Property;

(c)    Lender and Lender's Consultant shall have received a signed and sealed "as-built" survey of the Project dated within ten (10) days of the proposed Funding Date, certified to Lender and Title Company, and showing the completed Improvements.

(d)    Lender shall have received written certification from Lender's Consultant that the Construction Work has been substantially completed, subject to punch list items, in accordance with the Budget and the plans and specifications for the Construction Work.

(e)    Lender shall have received an original hazard insurance policy complying with the terms of the Building Loan Mortgage and evidence that the current premium or installment payment due on such policy has been paid and that the policy is in full force and effect.

(f)    Lender shall have received a title continuation, continuing the Title Policy to the date of such Advance and increasing the coverage of the Title Policy by an amount equal to the Advance then being made if the Title Policy does not by its terms provide for such an increase, with a survey reading showing no new encroachments unless (i) such new encroachments shall be permitted by applicable law or the Loan Documents, and (ii) the applicable title policy shall insure that such new encroachments may remain as long as the Improvements shall stand.

(g)    Lender shall have received final lien waivers from the Construction

11

Manager, and all contractors and all subcontractors that worked on the Project.

For the avoidance of doubt, "completion" of the Construction Work shall be deemed to mean satisfaction of the requirements of this Section 2.4.

Notwithstanding anything to the contrary provided for herein, no Advances shall be made hereunder until such time as the Mezzanine Loan is fully funded.

2.5    Failure to Satisfy Construction Conditions.

(a)    In the event that Borrower has not satisfied the terms and conditions set forth in Section 2.2 and Section 2.3 hereof (including, without limitation, Section 2.3(j)) by May 23, 2019 (the "**Initial Construction Deadline Date**") such that the conditions to Lender's obligation to make the first Advance of the Loan have not been satisfied as of the Initial Construction Deadline Date, Borrower shall within three (3) days of notice by Lender, deposit with Lender, as additional security for the Loan, in a Lender controlled account, cash equity collateral (the "**Borrower Equity Requirement**") in an amount not less than Six Million and 00/100 Dollars ($6,000,000.00), which Borrower Equity Requirement shall be deposited by Borrower into a Lender-controlled cash collateral account and shall be applied by Lender, in Lender's sole and absolute discretion, (i) to Hard Costs, demolition and otherwise to construct the Improvements in accordance with the Budget, (ii) as pre-paid interest, which amounts shall be applied to the Monthly Payments (as defined in the Note) due in accordance with the Note, or (iii) to the Deferred Origination Fee (as defined in the Building Loan Note). Lender shall have a perfected first priority security interest in all funds held in such account. Notwithstanding anything to the contrary set forth herein, (X) the Borrower Equity Requirement shall be accounted for by Lender in determining whether the Budget is in balance pursuant to Section 2.2(m) hereof and (Y) Lender shall have no obligation to make any Advance of the Loan unless and until the entire Borrower Equity Requirement has been received and applied by Lender in accordance with this Section 2.5(a).

(b)    In the event that Borrower has not satisfied each of the terms and conditions set forth in Section 2.2 and Section 2.3 hereof (including, without limitation, Section 2.3(j)) by July 22, 2019 (the "**Subsequent Construction Deadline Date**" (provided, however that the Initial Required Buyout Requirement shall be increased to seventy percent (70%) of all trades doing work at the Property (the "**Subsequent Required Contractor Buyout**")) as of the Subsequent Construction Deadline Date, Lender shall have no obligation to make any Advances of the Building Loan.

2.6    Imprest Account. Notwithstanding anything to the contrary set forth herein, upon the satisfaction of the conditions set forth in Sections 2.2 and 2.3 hereof (including, without limitation, Sections 2.3(j)(4) and (5), Two Hundred Fifty Thousand Dollars ($250,000) of Loan proceeds shall be Advanced by Lender into an account (the "Imprest Account") held at a depository institution reasonably acceptable to Lender. In connection with, and as a condition to, the establishment of the Imprest Account, (i) Borrower shall have executed a cash collateral account agreement with Lender on Lender's then standard form establishing Lender's first priority security interest in such account and the funds deposited therein and (ii) Borrower shall have

delivered to Lender a "Will Serve" Letter executed by Construction Manager in form and substance reasonably satisfactory to Lender, which "Will Serve" Letter shall provide, among other things, that Construction Manager (I) shall only disburse funds (x) for Costs of Improvements and (y) upon Lender's receipt of a Draw Request with respect to each disbursement of the Imprest Account and (II) shall deliver duly executed lien waivers, as applicable, from all trade contractors for all lienable work performed, and all lienable labor or material supplied for which payment thereof has been made prior to the date of the applicable disbursement.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.1    <u>Representations and Warranties</u>:    Borrower represents and warrants to Lender, knowing that Lender will rely on such representations and warranties as incentive to make the Building Loan, that:

(a)    Borrower is a limited liability company duly organized and validly existing under the laws of the State of Delaware and has the authority to do business in the State of New York.  Borrower has, and will continue to have, the full power and authority and legal rights to own its properties, to carry on its business as now conducted and to perform its obligations under this Agreement.  Borrower conducts no business directly or indirectly except owning and operating the Project.

(b)    Borrower has the authority and legal right to execute and deliver this Agreement.  No consent, approval, authorization, exemption, notice, report, registration, filing or declaration that has not been obtained or made is required to be obtained or made with respect to the execution and delivery by Borrower of this Agreement.

(c)    Borrower has furnished Lender with true, correct and complete copies of its organizational documents.

(d)    Borrower, Guarantor, the Project and the Construction Work are in material compliance with all Legal Requirements applicable to Borrower, Guarantor, the Project or the Construction Work, and no written notice of noncompliance with any such Legal Requirements has been received Borrower, any Guarantor, or, to the best of Borrower's knowledge, by any other person or entity.

(e)    Neither Borrower nor Guarantor is in violation of any agreement the violation of which might reasonably be expected to have a material adverse effect on Borrower's or any Guarantor's business or assets.

(f)    Neither this Agreement nor the performance, fulfillment of or compliance with the terms and provisions hereof, nor the consummation of the transactions contemplated hereby, conflicts or will conflict with, or will result in a breach of, the terms, conditions or provisions of, or otherwise constitute a default under, or result in the creation of any lien (other than the lien of any of the Collateral Documents) upon any of the properties or assets of Borrower or any Guarantor under any agreement, instrument, arbitration award, order,

judgment, decree, statute, law, ordinance, franchise, certificate, permit, rule, regulation or the like to which Borrower or any Guarantor is subject, or by which properties or assets of Borrower or any Guarantor or the Construction Work are bound or affected.

(g)    This Agreement does not contain any untrue statement of a material fact made by or on behalf of Borrower or Guarantor.

(h)    Except as set forth on <u>Schedule G</u>, no litigation, investigation or administrative proceeding of or before any court, arbitrator or governmental authority is pending or, to Borrower's knowledge, threatened against Borrower, any Guarantor, or any assets thereof (i) is reasonably likely to have a material adverse effect on Borrower's ability to perform its obligations under this Agreement in accordance with the terms thereof, or Guarantors' ability to perform their respective obligations under the Guaranty, (ii) is reasonably likely to materially and adversely affect the financial condition of the Borrower or any Guarantor, (iii) is reasonably likely to materially impair the value of the Project, (iv) seeks to enjoin or similarly prevent the Construction Work or the use of the Improvements, or (v) is reasonably likely to question the validity of this Agreement.

(i)    No condemnation or taking by eminent domain of any portion of the Property, or affecting any roadways or utilities abutting the Property, or access to the Property therefrom has commenced, or is threatened in writing by any governmental authority.

(j)    All management, leasing, marketing, engineering, architectural, construction and maintenance contracts, relating to the Project or the Construction Work to which Borrower or any affiliates of Borrower is a party are listed in the schedule of contracts most recently furnished to Lender by Borrower, and true and complete copies of all such contracts, including all amendments thereto, have been made available to Lender or Lender's Consultant. All contracts listed in such schedule are in full force and effect in accordance with their respective terms, and, except as described in such schedule or by separate written notice to Lender, no party to any such contract has asserted any written claim of default or offset against Borrower or any affiliate of Borrower, with respect thereto, which claim, default or offset has not been cured or resolved.

(k)    Borrower has not sold, conveyed, assigned or otherwise transferred, or agreed to sell, convey, assign or otherwise transfer, any development, air or floor-area-ratio rights with respect to the Property.

(l)    Except as disclosed in any environmental reports delivered to Lender in writing prior to the date hereof, Borrower has no actual knowledge of any Hazardous Materials (as defined in the Building Loan Mortgage) located or disposed of on the Project, other than those customarily used (and in such amounts) in connection with construction projects of similar size and type in compliance with all applicable law.

(m)    Borrower's estate, rights, title and interest in, to and under the Mortgaged Property are subject to no liens, charges or encumbrances other than as contained in the Title Policy, including the liens of the Land Loan Mortgage and Building Loan Mortgage,

14

together with (i) customary construction and utility easements, (i) other survey exceptions, liens and easements reasonably approved by Lender, (iii) liens (other than environmental liens and any lien imposed under ERISA), if any, for taxes imposed by any governmental authority not yet due and payable or delinquent or which are being contested in accordance with the Loan Documents and (iv) liens imposed by law, such as mechanics' liens and other similar liens arising in the ordinary course of business, which liens may be contested in accordance with the terms of this Agreement, insured over or otherwise adequately bonded (in Lender's reasonable discretion) within thirty (30) days after filing (hereinafter collectively "**Permitted Exceptions**"), when executed, delivered and recorded, shall constitute a valid lien on such estate, rights, title and interest.

(n)      The Lien Law Statement has been prepared in accordance with Section 22 of the New York Lien Law.  The Budget sets forth all of the costs, expenses and fees (including costs, expenses and fees in connection with the making of the Building Loan) that Borrower expects to pay or anticipates becoming obligated to pay to complete the Construction Work.  Borrower is not aware of any permits required for the completion of the Project that should not be available as-of-right upon the submission of all required applications therefor.

(o)      Borrower has not dealt with any mortgage broker or other broker or finder in connection with the Building Loan other than the broker(s), if any, listed in the Section 22 Affidavit attached hereto.

(p)      All financial statements of Borrower and Guarantor heretofore given and hereafter to be given to Lender, are and will be true and complete in all respects as of their respective dates, fairly represent the financial conditions of the businesses or persons to which they pertain as of such date other that prospective statements, estimates or projections contained therein, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.

(q)      All necessary action has been, or will timely be, taken to permit the Construction Work according to the Budget and the full use of the Improvements for their intended purpose under all Legal Requirements.   When completed according to the Budget, the Improvements will comply with all Legal Requirements.

(r)      All utility services necessary for the Construction Work and the use of the Improvements are available to the Property or will be available upon completion of the Construction Work.  All roads necessary for the full use of the Project for its intended purpose have been completed, or the necessary rights-of-way therefor have been acquired or dedicated, and all necessary steps to date have been taken to insure the completion thereof.

(s)      All documents furnished to Lender by or on behalf of Borrower, as part of or in support of the Building Loan application or pursuant to this Agreement or otherwise in connection with the Building Loan or the Collateral Documents, are true, correct, complete and accurately represent the matters to which they pertain as of the date so delivered, other that prospective statements, estimates or projections contained therein.

(t)    Borrower and Guarantor are, and upon consummation of the transaction contemplated by this Agreement, the Collateral Documents and any other related documents, will be, solvent.

(u)    Borrower has advised the Title Company in writing prior to the issuance of the Title Policy whether any survey, soils testing, site development, excavation or other work related to the construction of the Improvements was begun or done before the Building Loan Mortgage was recorded.

3.2    Continuing Effectiveness:  All representations and warranties contained herein shall be deemed continuing and in effect at all times while Borrower remains indebted to Lender and shall be deemed to be incorporated by reference in each requisition for advance by Borrower, unless Borrower specifically notifies Lender of any change therein and upon such notification, such representations and warranties shall be deemed modified accordingly.

# ARTICLE IV

## COVENANTS OF BORROWER

4.1    Covenants:  Borrower covenants and agrees as follows:

(a)    Borrower shall cause the Construction Work to be performed continuously and in a timely manner, subject to Force Majeure, in accordance with the Budget approved by Lender and in compliance with all Legal Requirements, so that the Construction Work shall be complete by the Scheduled Completion Date, TIME BEING OF THE ESSENCE, unless extended by exercise of any option in the Building Loan Note, if any exists, for such period, and as otherwise extended by Lender in its sole and absolute discretion; *provided, however*, Borrower, at its own expense, shall have the right to contest the enforceability or validity of any Legal Requirement which affects Borrower and/or the Property, provided, that (i) there is no Event of Default; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay any amount or perform any obligation which it was previously contesting, together with all costs, interest and penalties which may be payable in connection therewith, and (v) to the extent Lender determines, in its sole but reasonable discretion, that, with respect to any contest, the amount at stake is equal to or in excess of $5,000,000.00, then, unless as a condition to maintaining such contest Borrower is required to pay the amount of such Legal Requirement or cost, or to post a bond or make a deposit with a court or other governmental authority in the full amount of such Legal Requirement or cost, Borrower shall deposit with Lender cash, or other security as may be approved by Lender, in an amount equal to one hundred ten percent (110%) of the contested monetary amount or the amount necessary so as to comply, as reasonably estimated by Lender, to insure the payment thereof, together with all interest and penalties thereon.

(b)    Borrower shall receive the proceeds of the Building Loan subject to

the trust fund provisions of Section 13 of the Lien Law. Borrower shall use such proceeds solely and exclusively for the Line Items set forth in the Budget, subject to no changes except such changes (i) as do not increase the Budget by more than $250,000 for any individual change, (ii) as do not increase the Budget by more than $1,000,000 in the aggregate for all changes then made to date, (iii) as provided above with respect to reallocations of the contingency line item, (iv) as required by applicable law or (v) as have been reasonably approved by Lender and Lender's Consultant.

(c)     Other than Permitted Exceptions, Borrower shall keep the Project free from liens and encumbrances, shall pay promptly all persons or entities supplying work or materials with respect to the Construction Work and shall within thirty (30 days of actual knowledge of any lien that is not a Permitted Exception discharge by bond, payment or otherwise, or make other arrangements acceptable to Lender with respect to, any mechanic's or other lien filed against the Project or the Borrower; *provided, however,* that Borrower shall have the right to contest in good faith and with diligence the validity of any such liens or claims upon furnishing to the Title Company of such security or indemnity as the latter may require to induce it to issue an endorsement to the Title Insurance Policy insuring against or without exception for all such claims or liens.

(d)     Borrower shall pay promptly when due and before the accrual of penalties thereon all taxes including all real and personal property taxes and assessments levied or assessed against Borrower or the Project and all utility fees and charges in connection with the Project, and to provide Lender with receipted bills therefor if requested by Lender; *provided, however,* that Borrower shall have the right to contest in good faith and with diligence the validity of any such taxes and assessments upon furnishing to the Title Company of such security or indemnity as the latter may require to induce it to issue an endorsement to the Title Insurance Policy insuring against or without exception for all such claims or liens.

(e)     Borrower shall maintain in effect at all times while Borrower is indebted to Lender the insurance policies required by the Building Loan Mortgage, and shall notify Lender of any change in the status of such insurance within five (5) Business Days of Borrower's receipt of notice of any such change. Borrower shall repair and restore any casualty loss to the Improvements whether completed or under construction, except for current improvements intended to be demolished in connection with the Construction Work and to the extent that Lender does not make casualty insurance proceeds available to Borrower for that purpose or insurance proceeds are otherwise not available to cause such restoration.

(f)     Borrower shall pay all commitment, loan, reasonable servicing, administrative and out-of-pocket inspection fees of Lender, and all expenses involved in perfecting the lien status or priority provided by the Collateral Documents and all other actual out-of-pocket expenses of Lender directly related to the Building Loan, the protection and preservation of the Project or the enforcement of any provision of this Agreement or of the Collateral Documents, including, without limitation, recording fees and taxes, title and lien search charges, title insurance charges, Lender's Consultant's fees and reasonable attorneys' fees (including fees for appellate proceedings), real property taxes for the Project, personal property taxes for the Project and insurance premiums for the Project, and shall indemnify and hold Lender harmless against all

actual out-of-pocket claims, losses, expenses and liabilities, including reasonable attorneys' fees, incurred by Lender on account of any claim by any party arising out of the Building Loan or Lender's interest in or lien upon the Property or Improvements other than those determined by a court to have been caused by Lender's gross negligence or willful misconduct or that arise solely after the Project has been transferred pursuant to an exercise of remedies under the Collateral Documents or an accepted deed-in-lieu thereof

(g)    Borrower shall deposit the Building Loan Deficiency Amount and/or the Line Item Deficiency Amount with Lender within twenty (20) days after Lender's demand therefor.

(h)    Borrower shall: (i) furnish promptly to Lender such information as Lender may reasonably require concerning:  costs, progress of construction, marketing, and such other factors relating to the Project as Lender may specify; (ii) notify Lender promptly of (A) any material litigation instituted or threatened in writing against Borrower or any Guarantor, any deficiencies asserted or liens filed by the Internal Revenue Service against Borrower, any Guarantor, the Property or the Improvements, any audits of any Federal or State tax return of Borrower or any Guarantor, and the results of any such audit, (B) any condemnation or similar proceedings with respect to any of the Property or Improvements or any proceeding seeking to enjoin the Construction Work and/or the intended use of the Improvements, (C) all material changes in governmental requirements pertaining to the Construction Work, the Project, utility availability, and Borrower's anticipated cost of completion of the Construction Work, and (D) any other matters which could reasonably be expected to materially and adversely affect Borrower's ability to perform its obligations under this Agreement.

(i)    Borrower shall maintain complete and accurate account books and records with respect to the Building Loan, the Project, and the Construction Work, which books and records shall reflect the consistent application of accepted accounting principles, and to make such books and records available at reasonable times and upon reasonable notice for inspection and copying by Lender or its agent.

(j)    Borrower shall permit Lender and its agents to have access to the Project at reasonable times; shall permit Lender to maintain a sign on the Property that is approved by Borrower and in accordance with all legal requirements and otherwise publicize Lender's role as construction lender.

(k)    Borrower shall not authorize or permit any changes to the Budget or the working drawings with respect to any portion of the Construction Work, without the prior written consent of (i) all governmental bodies having jurisdiction to the extent such approval is required by law or regulation, (ii) Lender, and (iii) Lender's Consultant as required by Section 4.1(b) hereof.

(l)    Borrower shall notify Lender promptly of the names and addresses of all contractors, subcontractors and materialmen who are employed in connection with the construction of the Improvements, and whose names and addresses were not heretofore supplied to Lender.

18

(m)     Borrower shall furnish to Lender, if Lender so requests in writing, the contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Improvements.

(n)     Borrower shall not permit any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangement wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Project, unless authorized in advance by Lender in writing.

(o)     Borrower shall, at Lender's request, execute and deliver to Lender all further documents and perform all other acts which Lender reasonably deems necessary or appropriate to perfect or protect its security for the Building Loan.

(p)     Borrower shall not enter into any agreement or take any action that would result in the occurrence of an Event of Default or, subject to Section 3.2 above, would otherwise cause Borrower's representations and warranties contained herein to be incorrect or misleading.

(q)     Borrower shall not engage in any business other than the operating, owning, managing, constructing, developing, and leasing of the Project.

(r)     Borrower shall furnish to Lender's Consultant copies of all construction contracts in excess of $500,000, and any modifications thereto, when and as the same shall be executed and delivered.  Each such construction contract (and each agreement in excess of $500,000 with respect to the Project and/or Construction Work between Borrower and Architect or Construction Manager) shall contain provisions in form and substance reasonably satisfactory to Lender pursuant to which Lender shall be entitled to notice and an opportunity to cure any defaults by Borrower thereunder and to assume (at Lender's sole option) the rights and obligations of Borrower thereunder following the occurrence and during the continuance of any Event of Default.

(s)     Borrower shall timely obtain all permits required for the completion of the Construction Work.

(t)     Borrower (i) shall permit and shall cause each contractor to permit Lender's Consultant and any other agent or representative of Lender, at Borrower's sole cost and expense, to enter upon the Project at all reasonable times during the Construction Work, upon reasonable notice and accompanied by Borrower or Borrower's agents, to inspect the Construction Work, the Improvements and all materials to be used in the Project, and (ii) shall permit Lender, Lender's Consultant and any other agent or representative of Lender, at reasonable times upon reasonable notice, to examine all information and documents, including books, contracts and records, relating to the Construction Work and/or the Project, and shall reasonably cooperate and cause each contractor to reasonably cooperate with the Lender's Consultant to enable it to perform

19

its functions hereunder.  At the time of each inspection by Lender's Consultant, Borrower shall make available to Lender's Consultant daily log sheets, if available, covering substantially all of the period since the immediately preceding inspection, showing, for each day during such period, contractors and sub-contractors on the job, the number of workers employed by each, delays encountered and the status of construction.  Notwithstanding the foregoing, Lender shall not have any duty to make inspections or cause inspections to be made and shall not incur any liability or obligation as a result of making or not making any such inspection.

(u)    Borrower, upon written demand of Lender's Consultant, together with a reasonable explanation therefor, shall correct or cause the responsible contractor(s) to correct all actual defects in the Construction Work, or any part thereof, that may be noted by the Lender's Consultant.  In the event the Lender's Consultant and Borrower disagree as to whether a defect exists, each shall reasonably cooperate to determine whether a defect exists, but the ultimate determination as to whether a defect exists shall be made by Lender's Consultant.  The making of any Advance shall not constitute a waiver of the right of Lender to require compliance with this covenant with respect to any such defects.

(v)    Borrower shall not make any payment to any contractor with respect to labor or materials relating to the Project unless, in compliance with Section 34 of the New York Lien Law, Borrower shall simultaneously obtain a lien waiver from such contractor with respect to labor performed or materials furnished by such contractor.

(w)    Borrower shall duly perform and observe, or shall cause to be performed and observed, all of the covenants, agreements and conditions on its part to be performed and observed under the Building Loan Note, the Collateral Documents, and by this reference all of such covenants, agreements and conditions are hereby made a part of this Agreement to the same extent as if fully set forth herein.

(x)    Borrower shall give notice to Lender within five (5) Business Days after Borrower becomes aware of any representation or warranty of Borrower contained herein is no longer true and correct.

(y)    All Construction Work shall be done in a manner that shall adequately protect tenants, if any, under the Leases, and their employees and invites, from personal injury and loss of property, and shall otherwise be consistent with the requirements of such leases with respect to the continued occupancy of such tenants during the Construction Work.

(z)    Borrower shall deliver this Agreement and the Lien Law Statement to the Title Company for filing in the County Clerk's Office in the county in which the Property is located when and as required by Section 22 of the Lien Law.

(aa)    Borrower shall maintain its existence and shall be in good standing at all times.

(bb)    Borrower shall employ suitable means to protect from theft or vandalism all portions of the Improvements and all tools and building materials stored on the

20

Property.

## ARTICLE V

## EVENTS OF DEFAULT

5.1    Events of Default:  The occurrence of any of the events listed in this Article shall constitute an event of default ("**Event of Default**") under this Agreement:

(a)      The assignment or attempted assignment by Borrower of this Agreement, any rights hereunder, or any Advance to be made hereunder (other than payments entitled to the proceeds of such Advances), or the conveyance, lease, mortgage, or any other alienation or encumbrance of the Project or any part thereof, or any estate or right therein without the prior written consent of Lender, except as explicitly permitted herein or by the Collateral Documents.

(b)      If any written certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Borrower pursuant to or in connection with this Agreement or otherwise (including, without limitation, representations and warranties contained herein) or as an inducement to Lender to extend any credit to or to enter into this Agreement proves to have been false or misleading in any material respect at the time as of which the facts therein set forth were stated or certified or to have omitted a material fact or any substantial contingent or unliquidated liability or claim against Borrower or any Guarantor or if on the date of execution of this Agreement there shall have been any materially adverse changes in any of the facts previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Lender at or prior to the time of such execution, and, in any such case, such is not corrected for fifteen (15) days after the first to occur of (A) Borrower's knowledge thereof or, in the case of a misrepresentation under the Guaranty, Guarantor's knowledge thereof, or (B) written notice from Lender.

(c)      The failure by Borrower to satisfy the conditions to the Final Advance set forth in Section 2.4 of this Agreement on or before the Scheduled Completion Date.

(d)      The cessation of Construction Work for any period of sixty (60) consecutive Business Days after the General Contract has been signed and delivered.

(e)      Intentionally omitted.

(f)      If Borrower shall fail to keep, observe and/or perform any of the other covenants, conditions, obligations or agreements contained in this Agreement, and such default shall continue for a period of ten (10) days after written notice from Lender to Borrower in the case of a default that can be cured by the payment of money and thirty (30) days after written notice from Lender to Borrower in any other case; provided, however, that if such default can be cured but cannot reasonably be cured within such ten (10) day or thirty (30) day period, an Event of Default shall not be deemed to have occurred so long as (i) Borrower commences an action to remedy such default promptly after notice, and (ii) Borrower pursues such remedial action to

completion with due diligence and dispatch.

(g)    If an "*Event of Default*" (as such term is defined in the Building
Loan Mortgage) shall occur under the Building Loan Mortgage or any of the Collateral
Documents.

(h)    If any representation or warranty contained in this Agreement shall
no longer be true and correct in all material respects; *provided, however*, that if such representation
or warranty is, by its nature, capable of being cured and is not reasonably likely to have a material
adverse effect on Borrower, Guarantor, the Property or Lender's security interest in the Property,
and such representation or warranty was not intentionally false or misleading in any material
respect when made, then the same shall not constitute an Event of Default hereunder <u>unless</u>
Borrower does not cure the same within ten (10) days after Borrower becomes aware that such
representation or warranty was false or misleading when made.

(i)    The institution by any lienor of a foreclosure action against the
Project or any part thereof that is not removed of record or adequately bonded within forty-five
(45) days.

(j)    The filing of any mechanic's lien against the Project that is not
removed of record, insured over or adequately bonded (in Lender's reasonable discretion) within
forty-five (45) days after filing.

(k)    Intentionally omitted.

(l)    The death of any guarantor or obligor of the obligations of Borrower
under the Building Loan; except that, the foregoing shall not constitute an Event of Default
hereunder if Borrower (i) provides written notice to Lender of such death of a Guarantor, within
ninety (90) days of such death, and (ii) Borrower provides a substitute Guarantor, which said
substitute shall (x) have at least the same financial wherewithal as the Guarantor that is being
replaced and (y) otherwise be reasonably satisfactory, in all respects to Lender, in Lender's sole
discretion.

(m)    Guarantor, either individually or collectively, shall (1) own less than
(X) prior to the Subsequent Construction Deadline Date (or such earlier date that Borrower shall
have deposited with Lender the Borrower Equity Requirement), one and fifty-four thousandths of
one percent (1.054%) and (Y) on and following the Subsequent Construction Deadline Date (or
such earlier date that Borrower shall have deposited with Lender the Borrower Equity
Requirement), five percent (5.00%) of the direct or indirect equity interests in Borrower, in each
case as demonstrated to Lender's satisfaction based upon an updated organizational chart and
organizational documents of Borrower's direct and/or indirect members or (2) cease to retain the
day-to-day management and control of Borrower.

(n)    Borrower shall fail to deposit the entire Borrower Equity
Requirement with Lender on or prior to the Initial Construction Deadline Date.

5.2   <u>Event of Default "Continuing"</u>.  An Event of Default shall be deemed to be "continuing" for all purposes of this Agreement, notwithstanding any purported curing of such Event of Default, unless, prior to the receipt by Borrower of a notice from Lender stating that Lender shall have elected to accelerate the indebtedness evidenced by the Building Loan Note Borrower shall have cured such Event of Default and so notified Lender or at any time as Lender has waived such Event of Default in writing.

## ARTICLE VI

## REMEDIES UPON DEFAULT

6.1   <u>Remedies</u>:   (a) If any Event of Default shall have occurred and be continuing, all obligations of Lender under this Agreement shall, at the option of Lender, cease and terminate, and Lender may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under any of the Collateral Documents, including, without limitation, the right to accelerate the Building Loan and foreclose any and all liens and security interests securing the repayment of the Building Loan under any of the Collateral Documents including, without limitation, the Building Loan Mortgage.

(b) In addition to the foregoing, if any Event of Default shall have occurred and be continuing, all obligations of Lender under this Agreement, including, without limitation, the obligation to make Advances, shall, at the option of Lender, cease and terminate, and Lender may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under the Building Loan Note or any of the Collateral Documents, including, without limitation, the right to accelerate the Building Loan and foreclose any and all interests securing the repayment of the Building Loan.  In addition to, and without limiting the foregoing, if any Event of Default shall have occurred and be continuing, Lender may take immediate possession of the Project as well as all other property to which title is held by Borrower and in which Lender has a lien as is necessary to fully complete the Construction Work and do anything in its sole judgment to fulfill the obligations of Borrower hereunder, including availing itself of and procuring performance of existing contracts, amending the same, or entering into new contracts with the same contractors or others and employment of watchmen to protect the Project from injury.  Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the premises to, upon the occurrence and during the continuance of an Event of Default, complete construction and equip the Improvements, to use unadvanced Building Loan funds or funds which Borrower may have deposited with Lender pursuant to this Agreement, or to advance funds in excess of the Loan Amount pursuant to this Agreement; to pay all taxes and assessments on the Property or Improvements not paid by Borrower when due and to add the amounts of any such payments to the amount of indebtedness secured by the Building Loan Mortgage; to make changes in the Budget which shall be necessary or desirable to complete the Construction Work in substantially the manner contemplated by the Budget; to retain or employ new construction managers, general contractors, contractors, subcontractors, architects, engineers and inspectors as shall be required to complete the Construction Work; to pay, settle, or compromise all bills and claims, which may be incurred in connection with the Construction Work; to purchase any fixtures, equipment, machinery, furniture or any other personal property as may be necessary or desirable for the

completion of the Construction Work or for the clearance of title; to execute all applications and certificates in the name of Borrower which may be required; to prosecute and defend all actions or proceedings in connection with the Construction Work, Property or Improvements, fixtures, equipment, machinery, furniture or any other personal property; and to do any act which Borrower might do in its own behalf relating to the Construction Work, Property or Improvements, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.  Notwithstanding anything to the contrary contained herein, Lender shall not be obligated to attempt to use, operate, occupy or manage the Project or any part thereof, perform the Construction Work, or perform any of the terms, conditions and agreements herein or in any construction contracts or in any other document on the part of Borrower to be performed, and Lender shall have no liability to Borrower, Guarantors or any other person or entity for failing, attempting to perform, or ceasing to perform the same, or for the manner of performing or attempting to perform the same, or any part thereof.

# ARTICLE VII

## MISCELLANEOUS

      7.1   Entire Agreement; Modification, Etc.:  This Agreement (together with the Collateral Documents and any certificates delivered simultaneously herewith) embody and constitute the entire understanding between the parties with respect to the transaction contemplated by this Agreement, and all prior agreements, understandings, representations and statements, oral and written, with respect to the transaction that is the subject of this Agreement are merged into this Agreement.  Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

      7.2   Exclusiveness:  ALL CONDITIONS TO THE OBLIGATIONS OF LENDER TO MAKE ADVANCES HEREUNDER ARE IMPOSED SOLELY AND EXCLUSIVELY FOR THE BENEFIT OF LENDER AND LENDER'S SUCCESSORS AND ASSIGNS AND NO OTHER PERSON OR ENTITY SHALL HAVE STANDING TO REQUIRE SATISFACTION OF SUCH CONDITIONS IN ACCORDANCE WITH THEIR TERMS OR BE ENTITLED TO ASSUME THAT LENDER WILL REFUSE TO MAKE ADVANCES IN THE ABSENCE OF STRICT COMPLIANCE WITH ANY OR ALL THEREOF AND NO OTHER PERSON OR ENTITY SHALL, UNDER ANY CIRCUMSTANCES, BE DEEMED TO BE BENEFICIARY OF SUCH CONDITIONS, ANY OR ALL OF WHICH MAY BE FREELY WAIVED IN WHOLE OR IN PART BY LENDER ANY TIME IF IN ITS SOLE DISCRETION IT DEEMS IT ADVISABLE TO DO SO.

      7.3   Notices:  Except as may otherwise be expressly provided in this Agreement, any notice, request, demand, instruction or other communication pursuant to this Agreement shall be in writing and shall be given in the manner provided in the Building Loan Mortgage.

24

7.4    Governing Law; Jurisdiction: This Agreement, the Building Loan Note, the Collateral Documents and all other documents or instruments relating to the Building Loan, and the rights and obligations of the parties thereto, shall be construed and interpreted in accordance with the laws of the State of New York. Lender and Borrower each hereby waives and renounces any right to a jury trial in any action, suit or proceeding in connection with this Agreement, the Building Loan Note or any other Collateral Document.

7.5    Headings: All descriptive headings of articles and sections in this Agreement are inserted for convenience only, and shall not affect the construction or interpretation hereof.

7.6    Severability: If any provision of this Agreement shall be held to be invalid, illegal, void or unenforceable in any respect, (a) such provision shall be given force to the fullest possible extent that it is valid, legal and enforceable, (b) such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and (c) this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

7.7    No Agency, Partnership or Joint Venture: Lender is not the agent or representative of Borrower, and Borrower is not the agent or representative of Lender. Borrower and Lender intend and agree that the relationship between them shall be solely that of creditor and debtor. Neither any provision in any of this Agreement nor any act or omission of Lender or Borrower shall be construed to create a partnership or joint venture between Borrower and Lender. This Agreement shall not make Lender liable to materialmen, contractors, craftsmen, laborers or others for goods delivered to or services performed by them upon the Project, or for debts or claims accruing to such parties against Borrower and there is no contractual relationship, either expressed or implied, between Lender and any materialmen, subcontractors, craftsmen, laborers, or any other person supplying any work, labor or materials for the Construction Work.

7.8    Waiver; Successive Remedies: Any failure (or series of failures) by Lender to insist (or election, or series of elections, by Lender not to insist) upon the strict performance of any of the terms, provisions and conditions of this Agreement or any of the other Loan Documents shall not be deemed to be a waiver of the same or any other term, provision or condition hereof or thereof and Lender shall have the right at any time thereafter to insist upon strict performance of any and all of the same. If Lender makes any Advance in the absence of strict compliance with any or all of the conditions of Lender's obligations to make such Advance, the same shall be deemed to have been made in pursuance of this Agreement and not in modification hereof. No course of dealing and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any indebtedness of Borrower to Lender shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Lender may remedy any Event of Default by Borrower to Lender or any other person, firm or corporation in any reasonable manner without waiving the Event of Default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for any and all of its expenses in so

25

remedying such Event of Default. All rights and remedies of Lender hereunder are cumulative.

7.9    Assignability:    Neither this Agreement nor any right or obligation hereunder, nor any Advance to be made hereunder is assignable by Borrower. At Lender's sole cost and expense, the rights of Lender under this Agreement are assignable in part or wholly and any assignee of Lender shall succeed to and be possessed of the rights of Lender hereunder to the extent of the assignment made, including the right to make advances to Borrower or any approved assignee of Borrower in accordance with this Agreement.

7.10    Inconsistencies with Other Building Loan Documents:    In the event of any conflict between this Agreement and the provisions of any of the Collateral Documents, the provisions of this Agreement shall control; provided, however, that any provision of any Collateral Document that imposes additional burdens on Borrower or restricts the rights of Borrower or gives Lender additional rights or remedies shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

7.11    Survival:    All of the representations, warranties, terms, covenants, agreements and conditions contained in this Agreement shall specifically survive the execution and delivery of this Agreement and the making of all Advances and shall, unless otherwise expressly provided, continue in full force and effect until the indebtedness evidenced by the Building Loan Note and any other amounts payable to Lender hereunder, or under any of the Collateral Documents, shall have been paid in full.

7.12    Negotiated Document:    Borrower acknowledges that the provisions and the language of this Agreement and the Collateral Documents have been negotiated, and are reasonable in light of all circumstances attendant to the execution hereof and thereof, and agrees that no provision of this Agreement or any Collateral Document shall be construed against either Lender or Borrower by reason of either Lender or Borrower having drafted such provision, this Agreement or any Collateral Document.

7.13    Exhibits:    All exhibits referred to herein are by such reference incorporated into this Agreement as if fully set forth herein.

7.14    Building Loan Note; Building Loan Mortgage.    The Building Loan shall be evidenced by and repaid in accordance with the Building Loan Note. The performance of Borrower's obligations under the Building Loan Note and this Agreement shall be secured by the Building Loan Mortgage and the other Collateral Documents.

7.15    <u>Set off</u>.  Borrower agrees that, in addition to (and without limitation of) any right of setoff, bankers' lien or counterclaim Lender may otherwise have, Lender shall be entitled, at its option upon an Event of Default, to offset balances (general or special, time or demand, provisional or final)held by it for the account of Borrower at any of Lender's offices against any amount payable by Borrower to Lender hereunder or under any other Collateral Document which is not paid when due (regardless of whether such balances are then due to Borrower), in which case it shall promptly notify Borrower thereof; provided that Lender's failure to give such notice shall not affect the validity thereof.  Payments by Borrower hereunder or under the other Collateral Documents shall be made without setoff or counterclaim.

7.16    <u>Borrower's Statement</u>:  A true statement under oath verified by Borrower, as required by Section 22 of the Lien Law, is attached hereto and made a part hereof as Schedule D and all the terms of such oath are incorporated herein by this reference.

7.17    <u>Indemnification</u>.  Borrower agrees to indemnify Lender and hold Lender harmless from and against all actual out-of-pocket claims, actions, suits, proceedings, actual out-of-pocket costs, expenses, brokerage or other fees, losses, damages (other than consequential, special or punitive damages, *except* to the extent alleged or imposed upon Lender by any third-party) and liabilities of any kind including in tort, penalties and interest, which Lender may incur in any manner other than Lender's own active negligence or willful misconduct, by reason of any matter relating to the Building Loan, the Construction Work, the Building Loan Mortgage or the ownership, condition, development, construction, sale, rental or financing of the Project or any part thereof. This indemnification shall continue in effect whether or not the Building Loan is partially or fully advanced and shall survive the repayment of the Building Loan, but shall not apply to anything arising solely after the indefeasible payment in full of the Building Loan or after the Borrower no longer owns the Project due to foreclosure or an accepted deed-in-lieu thereof.

7.18    BORROWER CONFIRMS AND ACKNOWLEDGES THAT WHILE THE MAXIMUM AMOUNT OF THE BUILDING LOAN IS UP TO $35,500,000.00, THE TOTAL AMOUNT OF THE BUDGET, IN LENDER'S DETERMINATION, MAY BE GREATER THAN SUCH AMOUNT.  BORROWER FURTHER CONFIRMS AND ACKNOWLEDGES THAT IT SHALL BE SOLELY OBLIGATED TO FUND THE DIFFERENCE BETWEEN THE BUILDING LOAN AND THE BUDGET FROM ITS OWN EQUITY, IF AND AS NECESSARY.

7.19    <u>Counterparts</u>.  To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature and acknowledgment of each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute single instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than a single instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgment of, or on behalf of, each of the parties hereto. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement.

**BORROWER:**

**4452 BROADWAY MAZAL LLC,**
a Delaware limited liability company

By: _____
Name:  Kfir Ribak
Title:   Authorized Signatory


**LENDER:**

**4452 BROADWAY 1 LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement.

**BORROWER:**

**4452 BROADWAY MAZAL LLC,**
a Delaware limited liability company

By: _____
Name:  Kfir Ribak
Title:   Authorized Signatory

**LENDER:**

**4452 BROADWAY 1 LLC,**
a Delaware limited liability company

By: _____
Name:   Joshua Zegen
Title:   Authorized Signatory

*[Signature Page to Building Loan Agreement]*

STATE OF NEW YORK          )

                                   ) ss:

COUNTY OF NEW YORK     )

On the _18th_ day of January, in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Kfir Ribak, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

ANDREW FISCHTHAL
Notary Public, State of New York
No. 01FI6340401
Qualified in New York County
Commission Expires April 18, 2020

STATE OF NEW YORK          )

                                   ) ss:

COUNTY OF NEW YORK     )

On the ___ day of January, in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

STATE OF NEW YORK          )
                                       ) ss:
COUNTY OF NEW YORK        )

On the ___ day of January, in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Kfir Ribak, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

STATE OF NEW YORK          )
                                       ) ss:
COUNTY OF NEW YORK        )

On the 22ⁿᵈ day of January, in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared, Joshua Tegen, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

TOM KORDENBROCK
Notary Public, State of New York
No. 01KO6371148
Qualified in New York County
Commission Expires February 20, 2022

## SCHEDULE A

### Premises

**As to Block 2170 Lot 62:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly side of Broadway as legally opened and the southerly side of Fairview as vested in the City of New York;

RUNNING THENCE southerly along said easterly side of Broadway 74.51 feet to the southerly lot line of land conveyed to the City Real Estate Co. by Emil Bloch by deed recorded August in the Register of the County of N.Y. in Liber 16, Sec 8 at cp 271

THENCE easterly along the southerly line of land so conveyed as of aforesaid 100.31 feet (103.31 tax map) to a point in a line drawn parallel with the easterly side of Broadway distant 100 feet easterly therefrom measured on a line drawn at right angles thereto;

THENCE northerly parallel with the easterly side of Broadway, 85.86 feet to said southerly side of Fairview Avenue;

THENCE westerly along said southerly side of Fairview Avenue 100.29 feet to the to the point or place of BEGINNING.

**As to Block 2170 Lot 400:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City and State of New York designated on the Tax Map of the City of New York, for the Borough of Manhattan as Section 8, Block 2170, Lot 400 and bounded and described as follows:

BEGINNING at a point on the southerly side of Fairview Ave., 100.30 feet easterly from the southeasterly corner of Fairview and Broadway measured along the Southerly side of Fairview Ave.;

THENCE northeasterly along the southerly and southeasterly side of Fairview Ave. as said Avenue curves and turns, 202 feet 5-3/4 inches;

THENCE southerly on a line forming an angle on its westerly side 28 degrees 12 feet 35 inches with the last mentioned course 242 feet 6-3/4 inches to the southerly line of land formerly of the City Real Estate Co.;

THENCE westerly 103.305 feet to a point distant 100.3 feet from the easterly side of Broadway as measured along the southerly side of land formerly of City Real Estate Co.;

THENCE northerly parallel with the easterly side of Broadway, 85.86 feet to the southerly side of Fairview Ave., at the point or place of BEGINNING.

EXCEPTING and RESERVING so much of the above the premises as has been taken by the City of New York.

## SCHEDULE B

**CONTRACTS REQUIRING DEPOSITS**

| Trade | Deposit |
|---|---|
| Windows | 20% |
| Masonry | 10% |
| Appliances | 50% |
| Flooring | 50% |
| Fixtures | 50% |
| Elevator | 10% |
| Site Connections | 50% |
| Cabinets | 50% |
| Doors | 10% |
| Tiles | 50% |
| Signage | 50% |
| Metal | 10% |
| MEP | 10% |
| Trash Chute | 10% |
| Bike racks | 50% |
| Parking lifts | 25% |

## **SCHEDULE C**

### **[Letterhead of Borrower]**

_____

_____

_____

Re:  Building Loan Agreement ("**Building Loan Agreement**") between **4452 BROADWAY MAZAL LLC** (the "**Borrower**") and **4452 BROADWAY 1 LLC** ("**Lender**") dated as of January \_\_\_, 2019

Requisition #\_\_\_\_                    Date:   _____, 20\_\_

Gentlemen:

        Pursuant to the Building Loan Agreement, Borrower hereby requests that Lender advance to [applicable contractor] [$_____] with respect to Hard Costs.  Attached hereto is the affidavit of _____ dated the date hereof and Borrower certifies that all statements in that affidavit are true and correct.

        Attached hereto are lien waivers for all Hard Costs included in any prior Advances and invoices for all Hard Costs to be included in this Advance.  Additionally, attached hereto are completed AIA Forms G702 and G703 or such forms as reasonably required by Lender signed and certified by the Architect and Construction Manager.  All capitalized terms used herein shall have the meaning given thereto in the Building Loan Agreement.

                             **4452 BROADWAY MAZAL LLC,**
                             a Delaware limited liability company

                             By:  _____
                             Name:
                             Title:

## AFFIDAVIT TO BE ANNEXED
## TO EACH REQUISITION

STATE OF            )
                          ) ss.:
COUNTY OF          )

_____, being duly sworn, deposes and says:

1.      I am the _____ of **4452 BROADWAY MAZAL LLC** (the "**Borrower**"), and have made due investigation as to the matters hereinafter set forth and am making this affidavit to induce **4452 BROADWAY 1 LLC** ("**Lender**") to consider making an advance of $_____ as hereby requested by Borrower to be remitted directly to certain contractors and material suppliers of the Construction Work, pursuant to the terms of a Building Loan Agreement, dated as of January 23, 2019 between Borrower and Lender and pursuant to the requisition to which this affidavit is attached ("**Current Requisition**").

2.      All representations and warranties contained in the Building Loan Agreement are true and accurate in all material respects as of the date hereof.

3.      No Event of Default exists under the Building Loan Agreement and, to the best of my knowledge, no event or condition has occurred and is continuing or existing that, with the lapse of time or the giving of notice, or both, would constitute such an Event of Default.

4.      The Improvements have not been damaged by fire or other casualty, and no part of the Property has been taken by eminent domain and no proceedings or negotiations therefor are pending or threatened in writing.

5.      The Construction Work is progressing in such manner so as to insure completion thereof in accordance with the Budget on or before the Scheduled Completion Date.

6.      All funds received from the Lender previously under the Building Loan Agreement have been expended for the sole purpose of paying for the costs set forth in the previous requisitions; and no part of said funds have used for any other purpose. No item of costs previously certified to the Lender in a requisition remains unpaid as of the date of this Affidavit (other than for the Retainage).

7.      All of the statements and information set forth in the Current Requisition, and all documents attached thereto, are true and correct in every material respect as of the date hereof, and all costs certified to the Lender in the Current Requisition accurately reflect the amounts due. All the funds to be received pursuant to the Current Requisition shall be used solely for the purposes of paying the items of cost specified therein or for reimbursing the Borrower for such items previously paid by the Borrower.

8.      Nothing has occurred subsequent to the date of the Building Loan Agreement that has or is reasonably likely to result in the creation of any lien, charge or encumbrance upon the Property or the Improvements or any part thereof, or anything affixed to or used in connection therewith or which has or is reasonably likely to substantially and adversely impair the ability of the Borrower to make all payments of principal and interest on the Building Loan Note or any other note from Borrower to Lender, the ability of the Borrower to meet its obligations under the Building Loan Agreement or the ability of the Guarantors to meet their respective obligations under the Guaranty.

9.      None of the labor, materials, overhead or other items of expenses specified in the Current Requisition submitted herewith have previously been made the basis of any prior requisition by the Borrower which resulted in an Advance by Lender or of any prior payment by the Lender.

10.     The estimated aggregate cost of completing the Construction Work, including Hard Costs and Soft Costs does not exceed $_____.

11.     All conditions to the Advance requested by pursuant to the Current Requisition have been met in accordance with the terms of the Building Loan Agreement (including, without limitation, Section 2.2 and 2.3 thereof).

12.     As of the date hereof, there are no defenses or offsets in connection with the Building Loan or the Collateral Documents, and Lender has complied with all requirements and obligations in connection with the Building Loan and the Collateral Documents.

The capitalized terms used herein have the meaning given thereto in the Building Loan Agreement.

_____

Sworn to before me this
____ day of _____, 20____


_____
Notary Public

## SCHEDULE D

AFFIDAVIT PURSUANT TO SECTION 22
OF THE LIEN LAW OF THE STATE OF NEW YORK

STATE OF NEW YORK          )
                                             : ss.:
COUNTY OF NEW YORK  )

KFIR RIBAK, being duly sworn, deposes and says:

(1)   I have an address at c/o HAP Investments LLC, 3 East 54th Street, 15th Floor, New York, New York 10022.  I am the Authorized Signatory of 4452 BROADWAY MAZAL LLC (the "**Borrower**"), the borrower mentioned in the Building Loan Agreement.

(2)   The amount of the Building Loan is: up to $35,500,000.00.

(3)   The consideration for the Building  Loan to be paid and the other expenses heretofore incurred or to be incurred in connection with and paid out of the Loan are (or are estimated to be) as follows:

|     |                                                          |           |
|-----|----------------------------------------------------------|-----------|
| a.  | Lender Origination Fee (POC)                             | $0.00     |
| b.  | Application Fee (POC)                                    | $0.00     |
| c.  | Underwriting Fee (POC)                                   | $0.00     |
| d.  | Construction Consultant Fee (POC)                        | $0.00     |
| e.  | Examination and insurance of title and recording fees and |         |
| f.  | Mortgage recording tax (POC)                             | $0.00     |
| g.  | Lender's Legal Fee (POC)                                 | $0.00     |
| h.  | Broker Fee (POC)                                         | $0.00     |

TOTAL                                                                          $0.00

(4)   The amount, if any, to be advanced from the Building Loan to repay amounts previously advanced by Borrower for Hard Costs (as hereinafter defined) is:                    $0.00

(5)   The net sum available to Borrower from the Building Loan to pay Hard Costs (less such amounts as may become due and payable for insurance premiums, interest on Building Loan mortgages, ground rent, taxes, assessments and water rents accruing during the making of the improvement after the date hereof) is:                    $35,500,000.00

(6)   The sum allocated from the Building

Loan towards Interest Reserve is:                                    $0.00

(7)    This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York.

(8)    If Borrower is a corporation or partnership, this statement is verified by deponent and not by Borrower because Borrower is a corporation or partnership, of which the deponent is an officer or general partner.

(9)    The facts stated above and any costs itemized on this statement are true, to the knowledge of the undersigned.

For the purposes of this Section 22 Affidavit the term "Hard Costs" shall me the "costs of an improvement" (as such term is defined in Section 2(5) of the New York Lien Law).

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.**

This statement is made pursuant to Section 22 of the Lien Law of the State of New York.

The facts herein stated are true to the knowledge of the deponent.

Kfir Ribak

Sworn to before me this
_18_ day of January, 2019

Notary Public

ANDREW FISCHTHAL
Notary Public, State of New York
No. 01FI6340401
Qualified in New York County
Commission Expires April 18, 2020

## <u>SCHEDULE E</u>

**Assignment and Subordination of Construction Management Agreement**

## ASSIGNMENT AND SUBORDINATION OF
## CONSTRUCTION CONTRACT

**THIS ASSIGNMENT AND SUBORDINATION OF CONSTRUCTION CONTRACT** (as amended, restated, supplemented or otherwise modified from time to time, this "Assignment") is executed effective as of January 23, 2019, by and between **4452 BROADWAY MAZAL LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "Borrower"), having an address at c/o HAP Investments LLC, 3 East 54th Street, 15th Floor, New York, New York 10022, and [_____], a _____ ("Contractor"), having an address at _____, for the benefit of **4452 BROADWAY 1 LLC**, a Delaware limited liability company (together with its successors and assigns, collectively, "Lender"), having an address at 825 Third Avenue, 37th Floor, New York, New York 10022.

## RECITALS:

**WHEREAS**, Borrower is the owner of certain premises commonly known as 4452 Broadway, New York, New York 10040, and as more fully described in the Mortgage (defined herein), as such term is hereinafter defined (collectively, the "Property"); and

**WHEREAS**, on the date hereof, the Lender has made a loan (the "Land Loan") to the Borrower in the original principal amount of $10,000,000.00 (the "Land Loan Amount") which Land Loan is evidenced by a Consolidated, Amended and Restated Note (the "Note") and secured by a Consolidated, Amended and Restated Mortgage and Security Agreement (the "Land Loan Mortgage"), as well as by the other Land Loan documents executed and delivered to Lender in connection with the Land Loan, as the same may be modified from time to time (collectively, including the Land Loan Note and the Land Loan Mortgage, the "Land Loan Documents");

**WHEREAS**, the date hereof, the Lender has made a building loan (the "Building Loan") to the Borrower in the original principal amount of up to $35,500,000.00 (the "Building Loan Amount") which Building Loan is evidenced by a Building Loan Note (the "Building Loan Note") and secured by a Building Mortgage and Security Agreement (the "Building Loan Mortgage"), as well as by the other Building Loan documents executed and delivered to Lender in connection with the Building Loan, including, but not limited to, that certain Building Loan Agreement between Borrower and Lender (the "Building Loan Agreement"), as the same may be modified from time to time (collectively, including the Building Loan Note, the Building Mortgage and the Building Loan Agreement, the "Building Loan Documents");

**WHEREAS**, on the date hereof, the Lender has made a project loan (the "Project Loan", and together with the Land Loan and the Building Loan, hereinafter, collectively, the "Loan") to the Borrower in the original principal amount of up to $3,000,000.00 (the "Project Loan Amount", and together with the Land Loan Amount and the Building Loan Amount, hereinafter, collectively, the "Loan Amount") which Project Loan is evidenced by a Project Loan Note (the "Project Loan Note", and together with the Land Loan Note and the Building Loan Note, hereinafter, collectively, the "Note") and secured by a Project Mortgage and Security Agreement (the "Project Loan Mortgage", and together with the Land Loan Mortgage and the Building Loan Mortgage,

hereinafter, collectively, the "Mortgage"), as well as by the other Project Loan documents executed
and delivered to Lender in connection with the Project Loan, including, but not limited to, that
certain Project Loan Agreement between Borrower and Lender (the "Project Loan Agreement"),
as the same may be modified from time to time (collectively, including the Project Loan Note, the
Project Mortgage and the Project Loan Agreement, the "Project Loan Documents", and together
with the Land Loan Documents and the Building Loan Documents, collectively, the "Loan
Documents");

      **WHEREAS**, pursuant to that certain _____ dated as of
_____ (the "Contract"), made by and between Borrower and Contractor, a true,
correct and complete copy of which is attached hereto as Exhibit A, Contractor provides certain
construction management services relating to the Property and Contractor is entitled to certain
fees, commissions or other payments provided therein (collectively, the "Construction
Management Fee");

      **WHEREAS**, this Assignment is given in connection with the terms of the Mortgage;

      **WHEREAS**, Lender requires as a condition to the making of the Loan that Borrower
assign the Contract to Lender and that Contractor subordinate its interest in the Construction
Management Fee to the lien of the Mortgage and the payment of all amounts accruing under the
Loan Documents as set forth below.

      **NOW, THEREFORE**, in consideration of the mutual covenants contained herein and
other good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged, and in order to induce Lender to make the Loan to Borrower, the parties hereto
hereby agree as follows:

      1.    Assignment of Contract. As additional security for the Loan, Borrower hereby
conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest
(but not Borrower's obligations) in and to the Contract, said transfer and assignment to
automatically become a present, unconditional assignment, at Lender's option, after the occurrence
of an Event of Default (as defined in the Mortgage). Borrower hereby irrevocably appoints Lender
as Borrower's attorney-in-fact from and after the occurrence of an Event of Default, which
appointment is coupled with an interest and is therefore irrevocable, with full power of substitution
in the name of Borrower, to do all things and to execute and deliver all documents and receipt for
all monies which are necessary or desirable in the performance or enforcement of the Contract.

      2.    Subordination of Contract. The Contract and any and all liens, rights, interests and
privileges (whether choate or inchoate and including, without limitation, all mechanic's and
materialmen's liens under applicable law) owed, claimed or held by Contractor, as applicable, in
and to the Property are hereby and shall at all times continue to be subject and unconditionally
subordinate in all respects to the lien of the Mortgage and security interests created or to be created
for the benefit of Lender under, and to the terms, covenants and provisions of, the Loan
Documents, and to any renewals, extensions, modifications, assignments, replacements, or
consolidations thereof and the rights, privileges, and powers of Lender thereunder.

      3.    Subordination of Construction Management Fee.

(a)    Notwithstanding anything to the contrary contained herein or in the Contract, Contractor hereby confirms and agrees that no Construction Management Fee of any sort whatsoever shall be due and payable in excess of the Construction Management Fee set forth in the Contract. If, notwithstanding the provisions of this Assignment, any additional payment or distribution of any character (whether in cash, securities, or other property) shall be received by Contractor in contravention of the terms of this Assignment, and before the Loan shall have been paid in full, such payment, distribution or security shall not be commingled with any other asset of Contractor, shall be held in trust for the benefit of Lender, and shall be paid over and transferred to Lender or its representative.

(b)    Upon the occurrence of an Event of Default under the Loan Documents, Lender may elect to provide notice of such Event of Default to Contractor and, if Lender should so elect, from and after the date of such notice no Construction Management Fee of any sort whatsoever shall be due and payable pursuant to the Contract for services rendered from and after the date of such notice; provided, however, Borrower shall continue to be responsible for any pending but unpaid invoices to date owing to Contractor under the Contract to the extent such accrue prior to the date of any such notice. Furthermore, if Lender should, pursuant to this Section 3(b), require such a cessation of payment to Contractor, Contractor shall not be required to continue the provision of services during such cessation.

4.    Borrower's Covenants. Borrower hereby covenants and agrees that Borrower will (a) fulfill and perform the terms, covenant and provision of the Contract to be fulfilled or performed by Borrower thereunder; (b) give prompt written notice to Lender of any written notice received by Borrower under the Contract, together with a complete copy of any such notice; (c) enforce (short of termination thereof), the performance and observance of the terms, covenant and provision of the Contract to be performed or observed by Contractor; (d) not assign the Contract or its rights and obligations thereunder, except for this Assignment and as may be otherwise permitted under the Loan Documents (and Borrower hereby represents and warrants to Lender that no previous assignment of its interest in the Contract has been made, which remain in effect as of the date hereof); and (e) not terminate or amend the Contract without the prior written consent of Lender.

5.    Contractor's Representations, Warranties and Covenants. Contractor represents and warrants to, and covenants with, Lender, as of the date hereof, that (a) Contractor has agreed to provide certain construction management services relating to the Property pursuant to the Contract; (b) the entire agreement between Contractor and Borrower with respect to the Property is evidenced by the Contract; (c) the Contract constitutes the valid and binding agreement of Contractor, enforceable in accordance with its terms, and Contractor has full authority under all state and local laws and regulations, to perform all of its obligations under the Contract; (d) neither Contractor nor Borrower is in default in the performance of any of its obligations under the Contract and all payments and fees required to be paid by Borrower to Contractor thereunder have been paid to the date hereof; and (e) Contractor will deliver to Lender copies of all notices received or given by Contractor with respect to any portion of the Property.

6.    Additional Contractor Covenants Regarding the Contract. Until such time as the Loan shall have been paid in full, together with any and all other amounts which shall be due and

payable under the terms of the Loan Documents, Contractor shall not take any of the following actions with respect to the Contract without the prior written consent of Lender:

(a)    declare a default under the Contract or exercise any of its remedies under the Contract (including, without limitation, terminating the Contract) without first notifying Lender in writing of any default by Borrower, simultaneously with notice to Borrower under the Contract or, if the Contract shall not require notice to Borrower with respect to such default, promptly after Contractor becomes aware thereof, and Lender shall have a cure period of thirty (30) days from the later of the date of receipt of such notice by Lender or the expiration of any cure period granted to Borrower under the Contract with respect to such default, to cure any such default (or if such default is not curable within said 30-day period, such additional time as is required by Lender, provided that, Lender commences such action within such 30-day period and thereafter diligently proceeds to cure such default; provided further that, if such default by Borrower is not susceptible to cure by Lender, such default shall be deemed waived by Contractor upon Lender taking possession of the Property);

(b)    enter into any agreement modifying or amending the Contract or increasing Borrower's obligations or reducing Borrower's rights under the Contract or increasing Contractor's rights or decreasing Contractor's obligations thereunder and any such modification or amendment without Lender's consent shall not be binding upon Lender;

(c)    commence any legal proceedings against Borrower or commence any remedial action against the Property;

(d)    commence or consent to any bankruptcy, insolvency, reorganization or similar proceeding by or against Borrower; or

(e)    assign any of its rights or obligations under the Contract.

7.    Subsequent Owner's Right to Continue or Terminate the Contract.

(a)    If Lender (including any nominee or designee of Lender) or any purchaser of the Property at foreclosure or by deed in lieu of foreclosure shall take title to all or any portion of the Property (a "Subsequent Owner"), Contractor shall, at the request of such Subsequent Owner, continue performance, on behalf of such Subsequent Owner, of all of Contractor's obligations under the terms of the Contract, provided that, such Subsequent Owner shall give Contractor notice of such request and such Subsequent Owner performs or causes to be performed the outstanding obligations of Borrower under the Contract, including the payment of any Construction Management Fees payable thereunder in connection with such performance. Notwithstanding the foregoing, the Contract shall be terminable at the option of any Subsequent Owner by written notice to Contractor, effective ten (10) days after delivery of such notice, at any time prior to any request by such Subsequent Owner to continue performance, and such Subsequent Owner waives the right to subsequently terminate the Contract (except pursuant to Section 7(b) hereof).

(b)    In the event a Subsequent Owner requests Contractor to continue performing under Section 7(a) hereof and then subsequently sells, assigns or transfers the

4

Property to a third party, such Subsequent Owner may terminate the Contract by written notice to Contractor, effective ten (10) days after delivery of such notice.

(c)     Upon any termination under this Section (i) Contractor and Borrower shall cooperate with any successor Contractor to ensure an orderly transfer of the construction management services relating to the Property; (ii) Contractor shall be entitled only to the payment of any Construction Management Fees earned prior to the termination of the Contract and, notwithstanding any provision to the contrary in the Contract, no monetary penalties, termination or similar fees shall be paid to Contractor, (iii) Contractor shall look solely to Borrower, and not to Lender, for the payment of any sums due to Contractor under the terms of the Contract or any obligations on the part of Borrower under the Contract, and (iv) to the extent permitted by law, Contractor hereby waives any and all rights to file any lien or encumbrance against the Property relating thereto.

8.     Termination of Contract by Lender.

(a)     Lender may terminate, or ultimately cause Borrower to terminate, the Contract, by notice to Contractor, effective ten (10) days after delivery of such notice (i) For Cause (as defined below); (ii) at any time after the occurrence of an Event of Default under the Loan Documents; or (iii) at any time following the insolvency or bankruptcy of Contractor. The term "For Cause" shall mean Contractor's gross negligence, willful misconduct or fraud or Contractor's default beyond the expiration of any applicable notice or grace period in the performance of any of its obligations under the Contract.

(b)     Upon such termination of the Contract under Section 8(a) above, of this Assignment, (i) Contractor and Borrower shall cooperate with any successor Contractor to ensure an orderly transfer of the construction management services relating to the Property and shall turn over all books and records, and contracts held by Contractor relating to the Property; (ii) subject in all instances to Section 3 above, Contractor shall be entitled to the payment of any Construction Management Fee earned prior to the termination of the Contract and unpaid invoices to date owing to Contractor under the Contract to the extent such Construction Management Fee accrues prior to the date of any such notice; provided that notwithstanding any provision to the contrary in the Contract or this Assignment (A) no monetary penalties, termination or similar fees shall be paid to Contractor in connection with such termination, and (B) no Construction Management Fee earned prior to the termination of the Contract or any other amounts payable or reimbursable to Contractor under the Contract, earned or accrued, shall be payable to Contractor in the event that they were earned or accrued after the event that led to a termination of the Contract For Cause, and (C) Contractor shall look solely to Borrower, and not to Lender, for the payment of any sums due to Contractor under the terms of the Contract permitted by this Assignment or any obligations on the part of Owner under the Contract, but in all cases only after the Loan has been repaid to Lender in full as provided for in the Loan Documents; provided, however, this item (C) shall not relieve any Subsequent Owner (as hereinafter defined) of liability in the circumstances described in Section 7(a) above, and (iv) to the extent permitted by law, Contractor hereby waives any and all rights to file any lien or encumbrance against the Property relating thereto.

9.     <u>Lender Not Obligated Under Contract</u>.  Contractor agrees that nothing herein shall impose upon Lender any obligation for payment or performance in favor of Contractor, except as, and to the extent, provided in <u>Section 7(a)</u> hereof if Lender requests that Contractor continue to perform its obligations under the Contract.

10.     <u>Lender's Reliance on Representations</u>.  Contractor has executed this Assignment for the purpose of inducing Lender to make the Loan to Borrower and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained when making Loan advances to Borrower, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

11.     **INDEMNIFICATION.  LENDER SHALL NOT BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION OF BORROWER AS A RESULT OF THIS ASSIGNMENT HEREBY EFFECTED, AND BORROWER SHALL PROTECT, INDEMNIFY, DEFEND AND SAVE LENDER HARMLESS FROM AND AGAINST ALL ACTUAL LIABILITIES, OBLIGATIONS, CLAIMS, DAMAGES, PENALTIES, CAUSES OF ACTION, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, COURT COSTS AND ATTORNEYS' FEES AND EXPENSES) (COLLECTIVELY, "CLAIMS") IMPOSED UPON OR ACTUALLY INCURRED BY OR ASSERTED AGAINST LENDER BY REASON OF ANY ACT UNDER THIS ASSIGNMENT. SHOULD LENDER INCUR ANY SUCH LIABILITY, LOSS OR DAMAGE BY REASON OF THIS ASSIGNMENT, OR IN DEFENSE OF ANY SUCH CLAIM OR DEMAND, THE AMOUNT THEREOF, INCLUDING, WITHOUT LIMITATION, COSTS, EXPENSES AND ATTORNEYS' FEES, TOGETHER WITH INTEREST THEREON (IF SUCH AMOUNT IS NOT PAID WITHIN TEN (10) DAYS OF WRITTEN DEMAND THEREFOR) AT THE DEFAULT RATE (AS DEFINED IN THE MORTGAGE), SHALL BE PAYABLE WITHIN TEN (10) DAYS OF WRITTEN DEMAND AND SHALL BE INCLUDED IN THE INDEBTEDNESS SECURED BY THE MORTGAGE. CONTRACTOR SHALL PROTECT, INDEMNIFY, DEFEND AND SAVE LENDER HARMLESS FROM AND AGAINST ALL CLAIMS IMPOSED UPON OR INCURRED BY OR ASSERTED AGAINST LENDER BY REASON OF, OR IN ANY WAY RELATED TO A BREACH OF ANY REPRESENTATION OR COVENANT CONTAINED HEREIN BY CONTRACTOR. BORROWER HEREBY AGREES TO PROTECT, DEFEND, INDEMNIFY AND HOLD LENDER HARMLESS FROM AND AGAINST ALL CLAIMS RESULTING FROM ANY FAILURE OF BORROWER TO PERFORM AND OBSERVE, AT THE TIME AND IN THE MANNER THEREIN PROVIDED, EACH OF THE COVENANTS, AGREEMENTS AND OBLIGATIONS OF BORROWER CONTAINED IN THE CONTRACT.**

12.     <u>Estoppel Certificate</u>.  Contractor shall, at the request of Lender, execute an estoppel certificate stating that the provisions of the Contract have not been modified or amended, and that all fees due and payable to Contractor under the Contract have been paid in full.

13.     <u>No Joint Venture</u>.  Lender and Contractor have no obligation to each other with respect to the Mortgage or the other Loan Documents except as provided herein and Contractor shall not be a third party beneficiary with respect to any of Lender's obligations to Borrower set

forth in the Loan Documents.  The relationship of Lender to Borrower, is one of creditor to debtor, and Lender is not a joint venturer or partner of Borrower.

14.    <u>Binding Nature of Assignment</u>.  This Assignment shall be binding upon Contractor and Borrower and Contractor's and Borrower's respective successors and permitted assigns and shall inure to the benefit of Lender and Lender's successors and assigns, any receiver in possession of the Property, and any party acquiring title to the Property by reason of foreclosure, power of sale, deed in lieu of foreclosure or otherwise.

15.    <u>Termination of this Assignment</u>.  At such time as the Loan is paid in full and the Mortgage has been released of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Contract shall terminate.

16.    <u>Notices</u>.  All notices or other communications hereunder shall be in writing and shall be effective for all purposes only if (a) hand delivered, subject to signed receipt or refusal to accept delivery on a business day by 5 p.m., (b) sent by a nationally recognized overnight delivery service (such as UPS or FedEx) for next-business-day delivery, before 5 p.m., or (c) sent by email on a business day with the subject line, in capital letters, NOTICE DELIVERED UNDER LOAN DOCUMENTS, and confirmed by an email reply from each addressee thereof before 5 p.m.  In each case the notice shall be addressed as follows (or to such other address or Person as a party shall designate from time to time by a proper notice to the other party at such party's previously noticed address):

If to Lender, to:

> 4452 BROADWAY 1 LLC
> 825 Third Avenue, 37th Floor
> New York, New York  10022
> Attention:  Shoshana Carmel
> Email: scarmel@madisonrealtycapital.com
> Telephone:  646-472-1900

With a copy to:

> Kriss & Feuerstein LLP
> 360 Lexington Avenue, Suite 1200
> New York, New York 10017
> Attention:  Jerold C. Feuerstein, Esq.
> Email: jfeuerstein@kandfllp.com
> Telephone: (212) 661-2900

If to Borrower, to:

> 4452 BROADWAY MAZAL LLC
> c/o HAP Investments LLC, 3 East 54th Street, 15th Floor
> New York, New York 10022
> Attention: Brian Shatz & Joshua Zegen
> Email: _____

With a copy to:

       Rosenberg & Estis, P.C.
       733 Third Avenue
       New York, New York 10017
       Attention: Eric S. Orenstein, Esq.
       Email: eorenstein@rosenbergestis.com

If to Contractor, to:

       [_____]
       _____
       _____
       Attention: _____
       Email: _____

With a copy to:

       [_____]
       _____
       _____
       Attention: _____
       Email: _____

17.    <u>Amendments; Modifications</u>.  This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower, Contractor or Lender.  Neither Borrower nor Contractor shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender, and any attempted assignment without such consent shall be null and void.

18.    <u>Inconsistencies with Contract</u>.  This Assignment shall supersede, to the extent inconsistent therewith, any provisions of the Contract.  Contractor has been furnished with a copy of the Mortgage and the other Loan Documents and is familiar with the terms thereof and Contractor hereby waives any provisions of the Contract to the extent such provisions are inconsistent with the terms and provisions of this Assignment, the Mortgage or the other Loan Documents.

19.    <u>Rights of Lender Cumulative</u>.  The rights of Lender under this Assignment shall be in addition to any other rights and remedies available to Lender under the terms of the Loan Documents.

20.    <u>Duplicate Originals; Counterparts</u>.  This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Assignment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall constitute a single

instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Assignment may be detached from any counterpart of this Assignment without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Assignment identical in form hereto but having attached to it one or more additional signature pages. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder. Counterparts hereof which are transmitted by facsimile or electronic transmission shall be given the identical legal effect as an original.

21.    Partial Invalidity. In the event any term or provision of this Assignment or the application thereof to any person or circumstance shall, for any reason and to any extent be invalid or unenforceable, the remaining terms and provisions of this Assignment shall not be affected thereby, but rather shall be enforceable to the fullest extent permitted by law.

22.    Further Documentation. The parties hereto agree to execute and deliver any and all further documents and instruments requested by any party hereto to give effect to the terms and provisions of this Assignment. Contractor agrees to execute such further agreements of subordination as may be determined by Lender to be necessary to establish or confirm the priority in lien and payment of the Mortgage over the lien of the Contract, which agreements shall be in substantially the same form as this Assignment and contain such matters of estoppel with respect to Contractor's receipt of fees as may be true as of the date of such execution and as may be required by Lender.

23.    Secondary Market. Lender may sell, assign, pledge, participate or transfer the Note, the Mortgage, this Assignment and the other Loan Documents to one or more Persons ("Investors") in accordance with the terms and provisions of the Mortgage. Lender may disclose the terms of this Assignment, the identity of Contractor or any principal of Contractor, or any financial information regarding Contractor, to any Investors or potential Investors. In addition, in connection with such sale or at any time prior to such sale, and from time to time, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Mortgage, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

24.    **GOVERNING LAW. THIS ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW) AND APPLICABLE UNITED STATES FEDERAL LAW.**

25.    **SPECIFIC NOTICE. IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT THIS ASSIGNMENT INCLUDES INDEMNIFICATION PROVISIONS WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY BORROWER OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the undersigned have executed this Assignment to be effective as of the date set forth in the first paragraph hereof.

<u>**BORROWER:**</u>

**4452 BROADWAY MAZAL LLC,**
a Delaware limited liability company

By: _____
Name: Kfir Rybak
Title: Authorized Signatory

**<u>CONTRACTOR</u>:**

[_____],
a _____


By: _____
Name:
Title:

# **EXHIBIT A**

## <u>Contract</u>

[A copy of the Contract follows this cover page]

## **SCHEDULE F**

**Will Serve Letter**



January 18, 2019

4452 BROADWAY 1 LLC,
its successors and/or assigns, as their interest may appear
825 Third Avenue, 37th Floor
New York, New York 10022

4452 BROADWAY 2 LLC
a Delaware limited liability company,
its successors and/or assigns, as their interest may appear
825 Third Avenue, 37th Floor
New York, New York, 10022

|  |  |  |
|---|---|---|
| Re: | Property: | 4452 Broadway, New York, New York 10040 |
|  | Improvements: | Construction of a _____ |
|  | Borrower: | 4452 BROADWAY MAZAL LLC |
|  | Mezz Borrower: | 4452 BROADWAY MAZAL SENIOR MEZZANINE LLC |
|  | Contract: | AIA Document B101-2007 Standard Form of Agreement between Owner and Architect, dated as of January 9, 2018, between Borrower, as owner, and [ARCHITECT] (*"Architect"*) |
|  | Contract Work: | New Building Design |
|  | Contract Amount: | $ 400,000.00 |

Ladies and Gentlemen:

We, Fischer+Makooi Architects, PLLC, are the architectural firm responsible for performing the Contract Work described above for Borrower under the Contract. In consideration of you making a loan to Borrower and/or Mezz Borrower, as applicable, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, we hereby agree with, and certify to you, as follows:

We certify to you that, (A) a true, correct and complete copy of the Contract is attached hereto as Exhibit A, (B) the Contract contains all of the agreements between us and Borrower with respect to the Contract Work set forth in the Contract, and (C) the plans and specifications for the Improvements, which plans and specifications are scheduled below (the *"Plans"*) and have been prepared by us, conform to and comply with the requirements of the Contract.

1

We further agree to certify to you upon the completion of the Improvements, that the same will have been completed in accordance with the Plans (except for such deviations as we may note in such certification). We agree to immediately notify you in writing of any deviations which may come to our attention during the course of construction.

Without limiting the generality of any of the foregoing, we also certify to you as follows:

1.  We have examined all applicable federal, state and local building, fire, safety, zoning, land use, landmark, health, sanitation, energy, environmental, ecological, sanitation and other similar codes, laws, ordinances and regulations affecting the Property or the Improvements, including, without limitation, guidelines promulgated by the Federal Housing Administration, and the Americans with Disabilities Act (collectively, the *"Building Laws"*). We have determined that the Property lies entirely in a [R7-2/C8-4] zoning district and have determined that the intended use of the Property and the Improvements is permitted under an approval from the New York City Board of Standards and Appeals and that the Improvements, when built according to the Plans, will comply with all Building Laws.

2.  If constructed in accordance with the Plans, the Improvements will have an interior saleable area of approximately [76,911] square feet.

We agree that (i) upon written notice from you that an Event of Default by Borrower and/or Mezz Borrower, as applicable, has occurred under its loan documents with you, or (ii) in the event of an event of default by Borrower under the Contract, we shall, at your request, continue performance on your behalf under the Contract in accordance with the terms thereof, provided we are paid for all services rendered pursuant to the Contract. We hereby acknowledge and consent to the collateral assignment from Borrower to you of the Contract.

Except as may otherwise be permitted in Borrower's and/or Mezz Borrower's loan documents with you, we shall not make any changes in the Plans or the Contract without your prior written consent. We shall promptly notify you of any changes in the Plans or the Contract of which we may become aware. We also agree that you shall be entitled to the same use of the Plans, including all drawings and any modifications, additions, enlargements or extensions thereof, as provided Borrower in the Contract, without additional cost to you.

We represent and warrant that (a) as of the date hereof, no party is in default under the Contract and there are no circumstances which would constitute a default thereunder upon the passage of time, the giving of notice, or both; and (b) as of the date hereof, we have no counterclaim, right of set-off or other defense to performance by us under the Contract.

We acknowledge that we have been advised that the collateral for the loan made by 4452 BROADWAY 2 LLC (*"Mezz Lender"*) to Mezz Borrower is a pledge of one hundred percent (100%) of the equity interest in Borrower and, to the extent Mezz Lender forecloses on such equity interests and thereafter Mezz Lender or its designee becomes the owner of the equity interests in Borrower, such transfer of ownership and consequent change of control shall, in each

case, have no adverse effect notwithstanding any other provision of the Contract and the Contract shall remain in full force and effect following such transfer and change of control.

**[SIGNATURE PAGE TO FOLLOW]**

Very truly yours,

[ARCHITECT]

By: _____

Name: Fariba Makooi

Title: Principal

## Schedule of "Plans"

| Sheet No. | Title | Date | Latest Revised Date | Comments |
|---|---|---|---|---|
| | | | | |

## **EXHIBIT A**

### **Contract**

[see attached]

## SCHEDULE G

**Litigation Schedule**

i)      In the Matter of the Application of 4452 Broadway Mazal LLC for an RPAPL 881
        Order against 57-63 Wadsworth LLC (NY Sup. Index No. 161780/2018); and

ii)     In Matter of Application of 4452 Broadway Mazal LLC for an RPAPL Order against
        Renaissance Associates (NY Sup. Ct. Index No. 160144/2018)