# Exhibit N

**(Immediately Follows This Page)**

# FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** (this "**Agreement**") is entered into as of July 11, 2022 (the "**Effective Date**"), by and among and **4452 BROADWAY 1 LLC,** a Delaware limited liability company having an address at 520 Madison Avenue, Suite 3501, New York, New York 10022 ("**Mortgage Lender**"), **4452 BROADWAY 2 LLC,** a Delaware limited liability company having an address at 520 Madison Avenue, Suite 3501, New York, New York 10022 ("**Mezz Lender,** and together with the Mortgage Lender, collectively, the "**Lender**"), **4452 BROADWAY MAZAL LLC,** a Delaware limited liability company with an address having an address at c/o HAP Investments LLC, 3 East 54th Street, 15th Floor, New York, New York 10022 (hereinafter, "**Mortgage Borrower**"), **4452 BROADWAY MAZAL SENIOR MEZZANINE LLC,** a Delaware limited liability company, having an address at c/o HAP Investments LLC, 3 East 54th Street, 15th Floor, New York, New York 10022 ("**Mezz Borrower**", and together with the Mortgage Borrower, collectively, the "**Borrower**"), **AMIR HASID** ("**AH**"), an individual having an address at 26 Vitkin Street, Tel Aviv, Israel,  and **NIR AMSEL** ("**NA**", and together with AH, collectively, the "**Guarantors**", and together with Lender, and Borrower, collectively, the "**Parties**", and each a "**Party**"), an individual having an address at Rupin 31, Tel Aviv, Israel.

## <u>RECITALS:</u>

## <u>THE LAND LOAN</u>

**WHEREAS**, on January 23, 2019, Mortgage Lender made a loan (the "**Land Loan**") to Mortgage Borrower in the original principal amount of Ten Million and 00/100 Dollars ($10,000,000.00) (the "**Land Loan Amount**"), which Land Loan is evidenced by an Amended and Restated Note, dated as of January 23, 2019, made by Borrower to Lender (the "**Land Loan Note**");

**WHEREAS**, the Land Loan Note is secured by, *inter alia*, an Amended and Restated Mortgage and Security Agreement in the amount of Ten Million and 00/100 Dollars ($10,000,000.00), dated as of January 23, 2019, made by Mortgage Borrower to Mortgage Lender (the "**Land Loan Mortgage**") securing certain real property known as 4452 Broadway, New York, New York 10040 (Block: 2170; Lots: 62 &400)(the "**Property**"), as well as by the other loan documents executed and delivered to Lender in connection with the Land Loan, as the same may be modified from time to time (collectively, including the Land Loan Note and the Land Loan Mortgage, the "**Land Loan Documents**");

## <u>THE BUILDING LOAN</u>

**WHEREAS**, on January 23, 2019, Mortgage Lender made a building loan (the "**Building Loan**") to Mortgage Borrower in the original principal amount of up to Thirty-Five Million and Five Hundred Thousand and 00/100 Dollars ($35,500,000.00) (the "**Building Loan Amount**"), which Building Loan is evidenced by a Building Loan Note, dated as of January 23, 2019, made by Mortgage Borrower to Mortgage Lender (the "**Building Loan Note**");

**WHEREAS**,  the Building Loan Note is secured by, *inter alia*, a Building Mortgage and

Security Agreement in the amount of up to Thirty-Five Million and Five Hundred Thousand and 00/100 Dollars ($35,500,000.00), dated as of January 23, 2019, made by Mortgage Borrower to Mortgage Lender (the "**Building Loan Mortgage**") securing the Property, as well as by the other loan documents executed and delivered to Mortgage Lender in connection with the Building Loan, including, but not limited to, that certain Building Loan Agreement between Mortgage Borrower and Mortgage Lender (the "**Building Loan Agreement**"), as the same may be modified from time to time (collectively, including the Building Loan Note, the Building Mortgage and the Building Loan Agreement, the "**Building Loan Documents**");

## THE PROJECT LOAN

**WHEREAS**, on January 23, 2019, Mortgage Lender made a project loan (the "**Project Loan**", and together with the Land Loan and the Building Loan, the "**Mortgage Loan**") to Mortgage Borrower in the original principal amount of up to Three Million and 00/100 Dollars ($3,000,000.00) (the "**Project Loan Amount**", and together with the Land Loan Amount and the Building Loan Amount, collectively, the "**Loan Amount**"), which Project Loan is evidenced by a Project Loan Note, dated as of January 23, 2019, made by Mortgage Borrower to Mortgage Lender (the "**Project Loan Note**", and together with the Land Loan Note and the Building Loan Note, collectively, the "**Mortgage Note**");

**WHEREAS**, the Project Loan Note is secured by, *inter alia*, a Project Mortgage and Security Agreement in the amount of up to Three Million and 00/100 Dollars ($3,000,000.00), dated as of January 23, 2019, made by Borrower to Lender (the "**Project Loan Mortgage**", and together with the Land Loan Mortgage and the Building Loan Mortgage, collectively, the "**Mortgages**"), as well as by the other loan documents executed and delivered to Lender in connection with the Project Loan, including, but not limited to, that certain Project Loan Agreement between Borrower and Lender (the "**Project Loan Agreement**"), as the same may be modified from time to time (collectively, including the Project Loan Note, the Project Mortgage and the Project Loan Agreement, the "**Project Loan Documents**"; and together with the Land Loan Documents and the Building Loan Documents, collectively, the "**Mortgage Loan Documents**");

**WHEREAS**, the Mortgage Loan is further secured by, among other documents, (i) that certain Conditional Guaranty, dated January 23, 2019, by the Guarantors in favor of Mortgage Lender (the "**Conditional Guaranty**"), (ii) that certain Debt Service and Carry Guaranty, dated January 23, 2019, by the Guarantors in favor of Lender (the "**Carry Guaranty**"), (iii) that certain Guaranty of Completion, dated January 23, 2019 by the Guarantors in favor of Lender (the "**Completion Guaranty**") and (iv) that certain Environmental Indemnity Agreement, dated as of January 23, 2019, by the Guarantors and the Mortgage Borrower in favor of Mortgage Lender (the "**Environmental Guaranty**"; together with the Conditional Guaranty, the Carry Guaranty, and the Completion Guaranty, each a "**Mortgage Guaranty**" and collectively, the "**Mortgage Guaranties**"), which Guaranties are included in the defined term "**Mortgage Loan Documents**";

**WHEREAS**, Mortgage Borrower and Mortgage Lender entered into that certain Loan Modification Agreement ("**First Mortgage Modification Agreement**") dated as of May 13, 2020;

**WHEREAS**, the First Mortgage Modification Agreement was modified by that certain Second Loan Modification Agreement dated as of August 25, 2020 ("**Second Mortgage Modification Agreement**", and together with the First Mortgage Modification Agreement, collectively, the "**Mortgage Modification Agreements**", which are included in the term Mortgage Loan Documents);

**WHEREAS**, capitalized terms used but not otherwise defined herein shall have the meanings afforded thereto in the Mortgage Loan Documents;

**WHEREAS**, a certain Event of Default exists under the Mortgage Loan Documents for, among other things, Mortgage Borrower's failure to discharge and/or bond the following mechanic's liens: i) lien in the amount of $52,643.00, filed by Hakeem Maintenance Services ("**Hakeem Lien**"), ii) lien in the amount of $1,292,613.51, filed by Broadway Construction Group Inc. ("**Broadway Lien**"), iii) lien in the amount of $31,595.00, filed by AMR Electrical Contracting Corp. ("**AMR Lien**"), and iv) lien in the amount of $32,982.44, filed by Able Equipment Rental Inc. ("**Able Lien**", and together with the Hakeem Lien, the Broadway Lien, and the AMR Lien, collectively, the "**Mechanics' Liens**") against Mortgage Borrower and the Property pursuant to Section 21(i) of the Mortgage (the "**Mechanic's Lien Default**").

**WHEREAS**, pursuant to the Mortgage Loan Documents, the Mortgage Loan matured on January 23, 2022 ("**Maturity Date**");

**WHEREAS**, Mortgage Borrower failed to pay the Mortgage Loans in full by the Maturity Date (the "**Mortgage Maturity Default**", and together with the Mechanic's Lien Default, collectively, the "**Mortgage Defaults**").

## THE MEZZANINE LOAN

**WHEREAS**, on January 23, 2019, Mezz Lender made a mezzanine loan (the "**Mezzanine Loan**", and together with the Mortgage Loan, collectively, the "**Loans**") to the Mezz Borrower, in the original principal amount of up to Four Million and 00/100 Dollars ($4,000,000.00) (the "**Mezzanine Loan Amount**"), which Mezzanine Loan is evidenced by a Mezzanine Promissory Note, dated as of January 23, 2019, made by Mezz Borrower to Mezz Lender (the "**Mezzanine Note**");

**WHEREAS**, the Mezzanine Note is secured by, *inter alia*, an Ownership Interests Pledge and Security Agreement, dated as of January 23, 2019 (the "**Pledge Agreement**") encumbering the equity interests in Mortgage Borrower that are owned by the Mezz Borrower (the "**Collateral**"), as well as by the other mezzanine loan documents executed and delivered to Lender in connection with the Loan, including, but not limited to, that certain Mezzanine Loan Agreement between Mezz Borrower and Mezz Lender (the "**Mezz Loan Agreement**"; and together with the Mezzanine Note, the Pledge Agreement and such other mezzanine loan documents, as the same may be modified from time to time, the "**Mezz Loan Documents**", and together with the Mortgage Loan Documents, collectively, the "**Loan Documents**");

**WHEREAS**, the Mezzanine Loan is further secured by (i) that certain Debt Service and Carry Guaranty dated as of January 23, 2019 (the "**Mezzanine Carry Guaranty**"), that certain Conditional Guaranty dated as of January 23, 2019 (the "**Mezzanine Conditional Guaranty**", and together with the Conditional Guaranty, collectively, the "**Conditional Guaranties**"), that certain Guaranty of Completion dated as of January 23, 2019 (the "**Mezzanine Completion Guaranty**"), and that certain Environmental Indemnity Agreement dated as of January 23, 2019 (the "**Mezzanine Environmental Guaranty**", together with the Mezzanine Carry Guaranty, Mezzanine Conditional Guaranty, and Mezzanine Completion Guaranty, collectively, the "**Mezz Guaranties**", and together with the Mortgage Guaranties, collectively, the "**Guaranties**", which shall be included in the term Mezz Loan Documents), given by the Guarantors in favor of Mezz Lender;

**WHEREAS**, Mezz Borrower and Mezz Lender entered into that certain Loan Modification Agreement ("**First Mezz Modification Agreement**") dated as of May 13, 2020;

**WHEREAS**, the First Mezz Modification Agreement was modified by that certain Second Loan Modification Agreement dated as of August 25, 2020 ("**Second Mezz Modification Agreement**", and together with the First Mezz Modification Agreement, collectively, the "**Mezz Modification Agreements**", which are included in the term Mezz Loan Documents);

**WHEREAS**, Mezz Borrower failed to pay the Mezzanine Loan in full by the Maturity Date (the "**Mezzanine Maturity Default**", and together with the Mechanic's Lien Default, collectively, the "**Mezzanine Defaults**", and together with the Mortgage Defaults, collectively, the "**Defaults**").

**WHEREAS**, as a result of the Defaults, on May 23, 2022, Mezz Lender sent Mezz Borrower a Notification of Disposition of Collateral ("**Disposition Notice**") notifying the Mezz Borrower that a sale of the Collateral (as that term is defined in the Disposition Notice) will take place on July 11, 2022 ("**UCC Sale**");

**WHEREAS**, capitalized terms used but not otherwise defined herein shall have the meanings afforded thereto in the Mezz Loan Documents;

## BORROWER'S AND GUARANTORS' FORBEARANCE REQUEST

**WHEREAS**, notwithstanding the Defaults, the Parties have agreed to resolve all claims each Party may have under the Loan Documents, as set forth herein; and

**WHEREAS**, conditioned on Borrower's timely performance and full compliance with this Agreement, the Lender is willing to agree to forbear from enforcing its rights under the Loan Documents until October 10, 2022 TIME BEING OF THE ESSENCE (the "**Termination Date**") (the period from the Effective Date to the Termination Date, or  the extent applicable, the  First Extended Termination Date (as defined below), the Second Extended Termination Date (as defined below), or the Third Extended Termination Date (as defined below) ("**Forbearance Period**"), on the terms, covenants and conditions set forth herein below.

**NOW THEREFORE**, for the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and among the Borrower, Guarantors, and Lender, as follows:

### Acknowledgment of Recitals

1.    The Parties acknowledge that the above referenced recitals are true and correct.

2.    <u>Acknowledgment of Indebtedness</u>. The Borrower and Guarantors ("**Borrower Parties**") hereby acknowledge and agree that, in accordance with the terms and conditions of the Loan Documents, they are jointly and severally liable to Lender as follows:

### Land Loan

As of August 1, 2022, the amounts are due and owing under the Mortgage Loan Documents are annexed hereto at **Exhibit "A-1"**.

### Building Loan

As of August 1, 2022, the amounts are due and owing under the Mortgage Loan Documents are annexed hereto at **Exhibit "A-2"**.

### Project Loan

As of August 1, 2022, the amounts are due and owing under the Mortgage Loan Documents are annexed hereto at **Exhibit "A-3"**.

### Mezz Loan

As of August 1, 2022, the amounts are due and owing under the Mortgage Loan Documents are annexed hereto at **Exhibit "A-4"**.

All interest accruing upon the principal balance of the Loans, including interest on protective advances shall accrue at the default rate of interest (24% per annum) (the "**Default Rate**"). Hereinafter all amounts due as set forth in this Paragraph, and such other amounts payable under the Loan Documents and this Agreement, including, but not limited to, attorneys' fees and costs, shall be referred to collectively as the "**Obligations**").

3.    <u>Forbearance</u>. As consideration of the Borrower's and Guarantors' performance in accordance with the terms of this Agreement, the Lender shall forbear from exercising its rights and remedies under the Loan Documents, until the earlier occurrence of either (a) a Termination Event (as defined below), or (b) the Termination Date, or to the extent applicable the First Extended Termination Date, the Second Extended Termination Date, or the Third Extended Termination Date. Notwithstanding the foregoing, nothing contained in this Agreement shall constitute a waiver by the Lender of any default by Borrower or Guarantors arising under the Loan Documents, whether now existing or hereafter arising, except for any default arising out of any

action or inaction of Lender that is the responsibility of Lender under this Agreement. This Agreement shall only constitute an agreement by the Lender to forbear from enforcing its rights and remedies under the Loan Documents, upon the terms and conditions set forth herein.

4.    Forbearance Terms.

(a)    As consideration for Lender agreeing to enter into this Agreement, (i) upon execution of this Agreement, Mezz Borrower shall pay to Mezz Lender, by wire transfer, the sum of $4,315.05 representing publication costs by the Mezz Lender in connection with the UCC Sale; and (ii) Borrower Parties agree and acknowledge that the Borrower shall remain current with all Property taxes;

(b)    From the Maturity Date until October 10, 2022 *only* (**"Forbearance Rate Period"**), provided the Borrower Parties comply with the terms and conditions of this Agreement, and provided neither a Termination Event (as defined below) nor an Event of Default under the Loan Documents occurs (other than the Default), then during the Forbearance Rate Period, the interest rate shall accrue on the Mortgage Loan at the annual rate equal to Sixteen Percent (16%) per annum on the unpaid principal balance of the Loans ("**Forbearance Interest Rate**"). Except as otherwise expressly modified hereby, the Parties hereby acknowledge and agree that all of the terms and provisions in the Loan Documents remain unmodified and in full force and effect. For the avoidance of doubt, if a Termination Event occurs during the Forbearance Rate Period, then the interest rate accrued and charged during the Forbearance Period shall be at the Default Rate effective from the Maturity Date, the Lender shall not waive the Default Rate interest accruing from the Maturity Date, the Forbearance Interest Rate shall not apply, and Borrower shall be obligated to pay the Mortgage Loan in accordance with the Obligations set forth in Paragraph 2.

(c)    After the Forbearance Rate Period, provided the Borrower Parties comply with the terms and conditions of this Agreement, and provided neither a Termination Event (as defined below) nor an Event of Default under the Loan Documents occurs (other than the Default), to the extent the Borrower Parties elect to extend the Termination Date pursuant Section(s) 4(d)-(f) below, the interest rate shall then accrue on the Mortgage Loan at the annual rate equal to Twenty Percent (20%) per annum on the unpaid principal balance of the Loans ("**Extended Forbearance Interest Rate**"). Except as otherwise expressly modified hereby, the Parties hereby acknowledge and agree that all of the terms and provisions in the Loan Documents remain unmodified and in full force and effect. For the avoidance of doubt, if a Termination Event occurs at any time after the Forbearance Rate Period, then the interest rate accrued and charged during the Forbearance Period shall be at the Default Rate effective from the Maturity Date, the Lender shall not waive the Default Rate interest accruing from the Maturity Date, the Forbearance Interest Rate shall not apply, and Borrower shall be obligated to pay the Mortgage Loan in accordance with the Obligations set forth in Paragraph 2.

(d)    Provided that no Termination Event (as defined below) has occurred, the Borrower Parties will have the option of receiving an extension of the Termination Date, to November 9, 2022 (the "**First Extended Termination Date**"). To extend the Termination

Date, the Borrower Parties must (a) advise the Mortgage Lender and its counsel, in writing, that it wishes to do so at least ten (10) days prior to the Termination Date ("**First Extension Notice**"), and (b) simultaneously with the First Extension Notice, Mortgage Borrower shall pay to Mortgage Lender, by wire transfer, the sum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) (the "**First Paydown**"), which shall be applied to the indebtedness due under the Mortgage Loan, and the order of payment shall be at the sole discretion of the Mortgage Lender;

(e)    Provided that no Termination Event (as defined below) has occurred, the Borrower Parties will have the option of receiving a second extension of the Termination Date, to December 9, 2022 (the "**Second Extended Termination Date**"). To further extend the Termination Date until the Second Extended Termination Date, the Borrower Parties must (a) advise the Mortgage Lender and its counsel, in writing, that it wishes to do so at least ten (10) days prior to First Extended Termination Date ("**Second Extension Notice**"), and (b) simultaneously with the Second Extension Notice, Mortgage Borrower shall pay to Mortgage Lender, by wire transfer, the sum of Seven Hundred Fifty Thousand Dollars and 00/100 ($750,000.00) (the "**Second Paydown**"), which shall be applied to the indebtedness due under the Mortgage Loan, and the order of payment shall be at the sole discretion of the Mortgage Lender;

(f)    Provided that no Termination Event (as defined below) has occurred, the Borrower Parties will have the option of receiving a third and final extension of the Termination Date, to January 8, 2023 (the "**Third Extended Termination Date**"). To further extend the Termination Date until the Third  Extended Termination Date, the Borrower Parties must (a) advise the Lender and its counsel, in writing, that it wishes to do so at least ten (10) days prior to the Second Extended Termination Date ("**Third Extension Notice**"), and (b) simultaneously with the Third Extension Notice, Mortgage Borrower shall pay to Mortgage Lender, by wire transfer, the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "**Third Paydown**"), which shall be applied to the indebtedness due under the Mortgage Loan, and the order of payment shall be at the sole discretion of the Mortgage Lender;

(g)    Provided a Termination Event does not occur, then the Mortgage Borrower shall have until the Termination Date, or to the extent applicable, the First Extended Termination Date, the Second Extended Termination Date, or the Third Extended Termination Date TIME BEING OF THE ESSENCE, to pay off the full amount of the Obligations under the Mortgage Loan in accordance with this Agreement ("**Payoff**") as set forth in Section 2 above.

5.    Waiver of Claims and Release.

(a)    The Borrower Parties hereby acknowledge and agree that they have no offsets, defenses, demands of any kind or nature whatsoever,  claims, counterclaims or other causes of action arising at law or in equity or otherwise from the action or inaction of the Lender or its affiliates, members, agents, officers, principals, directors, employees, attorneys, representatives, predecessors, successors, and assigns (collectively, the "**Lender Parties**") with respect to the

Mortgage Loan, the Mezz Loan, the Loan Documents, the UCC Sale and the commercial reasonability of the UCC Sale, including, but not limited to notice of the UCC Sale and any advertising related to the UCC Sale, that the Borrower Parties now have, or ever did have, any offsets, defenses, claims, counterclaims or other causes of action arising from the action or inaction of the Lender Parties, whether known or unknown, at law or in equity, from the beginning of the world through the Effective Date of this Agreement, including, but not limited to, any lender liability claims, fraud, fraudulent inducement, and/or economic coercion, all of them are hereby expressly WAIVED, and the Borrower Parties each hereby RELEASE the Lender Parties from any liability therefor.  It is understood and agreed that this Paragraph shall not be deemed or construed as an admission by the Lender Parties of liability of any nature whatsoever arising from or related to the subject of this Paragraph or otherwise

(b)     Except to the extent (and solely to the extent) any of the following arises directly out of Lender's willful misconduct, or material violation of applicable law(s), the Borrower Parties hereby agree to defend, indemnify, and hold the Lender Parties harmless from and against any losses, damages, costs (including, without limitation, reasonable attorneys' fees, court costs, and costs of appeal), expenses, judgments, liens, decrees, fines, penalties, liabilities, claims, actions, suits, and causes of action (collectively, the "**Claims**") arising, directly or indirectly, from:

(i)     any breach by Mortgage Borrower, Mezz Borrower or Guarantors of any warranty or representation contained in this Agreement or in the documents executed and delivered by Borrower Parties pursuant to this Agreement (with this Agreement, sometimes collectively referred to as the "Borrower Documents");

(ii)    any material breach, default, or violation by Mortgage Borrower, Mezz Borrower or Guarantors of any covenant, agreement, or provision of the Borrower Documents or the Loan Documents, other than the failure to make payment under the Loan Documents

(iii)   any Claims or liabilities by third parties pertaining to injury to persons or damage to property arising at the Property excluding, however, any Claims or liabilities arising directly or indirectly from Lender's negligence or willful misconduct.

6.     Deed Conveyance.   (a) Simultaneously with the execution hereof, Mortgage Borrower shall execute and deliver to the Mortgage Lender to be held by the Escrow Agent (as defined below), in recordable form, a Bargain and Sale Deed With Covenant Against Grantor's Acts for the entirety of the Property (the "**Deed**") in substantially the form attached hereto and made a part hereof as *Exhibit "B-1"* including without limitation, all required transfer tax documentation requiring Mortgage Borrower's execution as grantor, as well as a Bill of Sale, substantially in the form attached hereto and made a part hereof, respectively, as *Exhibit "B-2"*, and Member Consent of Mortgage Borrower concerning the conveyance in the form attached hereto and made a part hereof as *Exhibit "B-3"* (together with the Deed, Bill of Sale, and Member Consent, hereinafter be collectively referred to as the "**Documents of Transfer**"), conveying title to the Property to the Mortgage Lender (the "**Conveyance**").  Mortgage Borrower hereby grants to Mortgage Lender a limited power of attorney, coupled with an interest, for the sole purpose of executing and/or completing any transfer documents necessary to record the Deed which is not

otherwise executed by the Mortgage Borrower (in the event of release of the Documents of
Transfer by the Escrow Agent), including, but not limited to the completion of any ACRIS
documents, and filling in the grantee on the Deed and any other Documents of Transfer, and
Mortgage Borrower shall cooperate fully with Mortgage Lender or its designee to accomplish the
Conveyance including, but not limited to, executing ACRIS documents and any other documents
required to complete the Conveyance and providing all necessary information to the Mortgage
Lender or its designee to facilitate same. For avoidance of doubt, the grantee on the Deed may be
any entity designated by the Mortgage Lender. Mortgage Borrower further agrees to execute any
additional documents required by a title company to procure the issuance of an owner's insurance
policy in connection with the Property, including without limitation, Affidavits of Title, Affidavits
of Consideration, and or the Affidavit for Sale Agreement. The Documents of Transfer shall be
held in escrow by Kriss & Feuerstein LLP (the "**Escrow Agent**") in accordance with the terms
and conditions of this Agreement. Upon the occurrence of a Termination Event, as defined herein,
the Escrow Agent, shall immediately release the Documents of Transfer to Mortgage Lender or its
designee upon request by the Mortgage Lender, and the Escrow Agent shall have no further
obligations under this Agreement. If no Termination Event occurs and upon Mortgage Borrower's
full compliance with the terms and conditions of this Agreement, the Escrow Agent shall destroy
the Documents of Transfer. The Parties hereby indemnify and hold the Escrow Agent harmless
for any actions taken in accordance with its duties as Escrow Agent in accordance with this
paragraph. The Escrow Agent shall not be liable in any way or to any person for its refusal to
comply with adverse claims and demands being made upon it, and shall not be responsible for any
act or failure to act on its part, nor shall it have any liability under this Agreement, except in the
case of willful default or gross negligence.

(b) Upon release of the Documents of Transfer by the Escrow Agent after a Termination
Event, the Mortgage Borrower hereby acknowledges, agrees, warrants and certifies that delivery
of the Deed will be an absolute conveyance of Mortgage Borrower's right, title, and interest in and
to the Property, together with all the buildings located thereon and appurtenances thereunto
belonging and appertaining, and with release of all dower and homestead rights, if any, and to the
Property, and subject to the terms and conditions of this Agreement, also convey, transfer, and
assign the rights of possession, rentals, and equity of redemption, in and to the Property, and that
the Deed was not and is not, in any way, intended as a mortgage, trust, or security of any kind, and
that possession of the Property, has been or will shortly be surrendered to the Mortgage Lender
from the Mortgage Borrower. Upon a Termination Event, and the release of the Deed by the
Escrow Agent, Mortgage Borrower shall have no right, title or interest to the Property, shall have
no right whatsoever to buy back the Property, the Mortgage Borrower's rights of redemption in
the Property shall be extinguished, and Mortgage Borrower shall not have any buy back options
or any other rights or options with respect to the Property.

(c) The Deed and the Conveyance shall not restrict the right of Mortgage Lender or
Mortgage Lender's designee to institute foreclosure proceedings against the Property if such
proceedings should become legally necessary in order to eliminate and to cure a defect in title to
the Property conveyed to Mortgage Lender or its designee by the Deed, and there shall be no
merger between the fee simple interest of Mortgage Lender and the Mortgages.

(d) Mortgage Borrower further represents that the Deed and other Documents of Transfer
will be and is herewith given voluntarily by Mortgage Borrower to the Mortgage Lender or its

designee, without any fraud, misrepresentation, duress, or under influence whatsoever, or any misunderstanding on the part of the Mortgage Borrower, or Mortgage Lender or its designee, and was not given as a preference against any other creditors of the Mortgage Borrower, and that at the time the Deed is given, there was no other person or persons, firm or firms, corporation or corporations, governmental agency or agencies, other than Mortgage Lender, interested either directly or indirectly, in the Property, and Mortgage Borrower has no other creditors whose rights would be prejudiced by the aforesaid conveyance.

(e)    In connection with the Conveyance, in the event any of the Documents of Transfer or any other document(s) requested by the Mortgage Lender or its designee, and/or a title company to record the Deed, are required to be replaced or re-executed, Mortgage Borrower shall cooperate in all respects with Mortgage Lender or its designee, or any title company (collectively, the "**Conveyance Cooperation Requirements**").

7.    <u>Further Mortgage Lender Remedies</u>. If (i) Mortgage Borrower and/or the Guarantors, their affiliates or successors-in-interest, attempt to cause the Deed to be set aside, (ii) the Mortgage Borrower and/or the Guarantors collude in order to set aside the Deed, (iii) the Deed shall be set aside as a result of Mortgage Borrower's and/or Guarantors' conduct in contravance of law or this Agreement, or (iv) Mortgage Borrower and/or Guarantors take any action which enjoins, delays or impedes in any manner Mortgage Lender's or Lender Affiliate's ownership of the Property following delivery of the Deed to the Mortgage Lender in accordance with this Agreement or completion of any foreclosure action pursuant to the terms of this Agreement or the Loan Documents, then, at the Lender's sole discretion, (a) to the extent previously discharged or satisfied, the outstanding indebtedness evidenced by the Loan Documents and all other outstanding indebtedness and obligations secured by the Mortgage and all other Loan Documents shall be revived, with interest to accrue on the outstanding principal thereof from the Maturity Date, at the Default Rate, and such interest shall be added to and become part of the obligations under the Mortgage Loan, and any prior satisfaction (other than by payment) and cancellation of such indebtedness shall be revoked; (b) the lien(s) of the Mortgages, if previously discharged by the Mortgage Lender, shall automatically be revived; (c) the Mortgage Lender or Lender Affiliate may complete foreclosure of any or all of the lien(s) of the Mortgages; (d) provided that Lender is fulfilling all of its obligations under this Agreement, the Borrower Parties shall remain and shall be (notwithstanding anything in this Agreement to the contrary) personally liable for the payment and performance of the Mortgage Loan Documents and the Mortgages, respectively, pursuant to the terms and provisions of each such loan document, including, but not limited to the Guarantors' obligations under the Guaranties, and for any deficiency resulting after foreclosure of the liens created by the Mortgages and the application of the proceeds from such foreclosure to the indebtedness secured thereby, such proceeds to be applied in such manner as the Lender may direct; and (e) the Mortgage Lender will have the right, at its option and without limiting any other remedy, to exercise all rights and remedies which it may have at law, in equity or under this Agreement and the Loan Documents and any instruments (including but not limited to the Mortgages) related thereto. Under no circumstances shall Mortgage Borrower and/or the Guarantors have the right to have any of the Documents of Conveyance set aside.

8.    <u>Agreements of Borrower and Guarantors.</u> The Borrower and Guarantors:

a)    hereby ratify, confirm, and reaffirm all and singular the terms and conditions of the Loan Documents. The Borrower and Guarantors each further acknowledge and agree that except as specifically modified in this Agreement, all terms and conditions of the Loan Documents shall remain in full force and effect;

b)    hereby ratify, confirm, and reaffirm that (i) the obligations secured by the Loan Documents and any future modifications, amendments, substitutions or renewals thereof, and (ii) all collateral, whether now existing or hereafter acquired, granted to the Lender pursuant to the Loan Documents or otherwise, shall secure all of the obligations set forth in the Loan Documents except as specifically modified in this Agreement;

c)    hereby confirm and agree that a novation is expressly denied and not intended to be effected, and except as amended or modified by this Agreement, the terms, provisions, conditions, rights, duties and obligations contained in the Loan Documents shall remain unchanged and unimpaired by this Agreement and are in full force and effect;

d)    shall, from and after the execution of this Agreement, execute and deliver to the Lender any standard additional documents, instruments, and agreements that the Lender may require, to the extent commercially reasonable, in order to vest or perfect the Loan Documents and the collateral granted therein more securely in the Lender and to otherwise give effect to the terms and conditions of this Agreement;

e)    confirm that they have the capacity, right, power and authority to execute this Agreement and to perform their respective obligations hereunder. Neither Borrower nor Guarantors have filed a petition in any case, action, or proceeding under the United States Bankruptcy Code or any similar state law; no petition in any case, action, or proceeding under the United States Bankruptcy Code or any similar state law has been filed against Borrower or Guarantors that have not been dismissed or vacated; and neither Borrower nor Guarantors have filed an answer or otherwise admitted in writing insolvency or inability to pay their debts in general or made an assignment for the benefit of creditors or consented to an appointment of a receiver or trustee of all or a material part of their property. To Borrower's or Guarantors' knowledge, the transaction contemplated herein is not a preference, voidable transfer, fraudulent conveyance, or otherwise in violation of the United States Bankruptcy Code or any other similar state or federal law.

9.    <u>Tax Advance.</u> Borrower Parties agree and consent to Mortgage Lender's advance in the amount of Forty-Two Thousand Three Hundred Seventeen and 00/100 Dollars ($42,317.00) ("**Tax Advance**") from amounts held by the Lender in escrow, for a reduction in the amount of Property taxes due and owing by the Mortgage Borrower as of July 1, 2022. Borrower Parties acknowledge that after the Tax Advance, Lender is not holding any escrowed funds. Borrower Parties further acknowledge that Lender is not obligated to make any advances under the Loans.

10.    <u>UCC Sale.</u> Borrower Parties agree and acknowledge that the UCC Sale is commercially reasonable and fully complies with all requirements and provisions of the New York

Uniform Commercial Code, and Borrower Parties waive any claims and defenses with respect to the commercial reasonability of any UCC sale of the Collateral. The Borrower Parties waive any right to stay the UCC Sale or any sale of the Collateral under the New York Uniform Commercial Code, including, but not limited to the filing by the Borrower Parties of any order(s) to show cause and/or any other motion or legal action seeking the stay of a UCC sale of the Collateral. Borrower Parties further agree and acknowledge that (i) Mezz Lender may market and publish the UCC Sale of the Collateral at any time prior to the Termination Date, and (ii) in the event that the Termination Date is extended in accordance with Section 4(b)-(d), the Mezz Lender shall have no obligation to further publish the UCC Sale of the Collateral.

11.     Release of Guarantors. Provided the Borrower Parties fully comply with Sections 6 and 7 herein, upon the occurrence of a Termination Event, and the Mortgage Lender or its designee records the Deed, then except for the obligations due for the Mechanics' Liens or any other recorded mechanic's lien affecting the Property, which the Guarantors shall remain liable for, the Guarantors shall be released from all other obligations under the Completion Guaranty and the Mezzanine Completion Guaranty (collectively, the "**Completion Guaranties**"). For avoidance of doubt, in-the-event that the Borrower Parties fully comply with Sections 6 and 7 herein and the Deed is released by the Escrow Agent to the Mortgage Lender or its designee, the Guarantors shall remain responsible under the Completion Guaranties for (i) payment of the Mechanics' Liens or any other recorded mechanic's lien affecting the Property; or (ii) the cost of removing the Mechanics' Liens or any other recorded mechanic's lien affecting the Property.

12.     Conditions Precedent. Lender's agreement herein shall not be effective unless and until each of the following conditions precedent has been fulfilled:

(a)  Mortgage Borrower has paid the outstanding Property taxes due through July 1, 2022 (less the Tax Advance) and Mortgage Borrower has provided Lender proof of payment of same.

13.     Termination Event. The occurrence of any one or more of the following events shall constitute an event of default (hereinafter, a "**Termination Event**") under this Agreement:

(a)  The failure of the Borrower to pay any amount required to be paid to the Lender under this Agreement as and when due TIME BEING OF THE ESSENCE, including, but not limited to, the Payoff on or before the Termination Date, subject to any extensions of the Termination Date under Section 4 above to the extent applicable, and all Property taxes that become due;

(b)  Mortgage Borrower's failure to comply with the Conveyance Cooperation Requirements or any other provision(s) set forth in Section 6 of this Agreement;

(c)  The failure of the Borrower Parties to comply with any other term or condition of this Agreement;

(d)  Any Event of Default under the Loan Documents (other than the Defaults); and/or

(e) Any voluntary or involuntary petitions filed for or by the Borrower or Guarantors under any chapter of the United States Bankruptcy Code.

14.    <u>Bankruptcy</u>. Borrower and Guarantors agree that, in event that either should file a bankruptcy petition under Title 11 of the United States Code (the "**Code**"), or an involuntary bankruptcy petition is filed against either or both of them, neither Borrower nor Guarantor shall oppose or cause to be opposed, a motion by Lender to modify or vacate any stay imposed under 11 U.S.C. 362(a) or under any other provision of the Code, nor shall any or all of them seek a discretionary stay of this foreclosure action in any court.

15.    <u>Rights Upon Occurrence of a Termination Event</u>.    Upon the occurrence of any Termination Event, (a) the Forbearance Period shall be terminated; (b) Lender shall have no further obligations to forbear under this Agreement; (c) Lender may immediately commence enforcing its rights and remedies under this Agreement and pursuant to the Loan Documents without any notice whatsoever to the Borrower and Guarantor or its attorneys, including, but not limited to, the commencement of a foreclosure action and the Mezz Lender shall have the right to commence a UCC sale of the Collateral under the Mezz Loan Documents; (d) interest for the Loans shall continue to accrue on the outstanding principal balances of the obligations set forth in the Loan Documents at the Default Rate, and Borrower shall immediately be obligated to pay the Loans in accordance with the obligations set forth in the Loan Documents; and (e) the Borrower agrees and acknowledges that the Documents of Transfer conveying title to the Property shall be released from Escrow to the Mortgage Lender or its designee, and the Mortgage Lender or its designee may, at its option record the Deed without notice to the Borrower Parties. For avoidance of doubt, except as expressly set forth herein, Lender is not required to send any notice(s) to the Borrower Parties.  Unless a Termination Event occurs under Section 13 herein and the Borrower is complying with the Cooperation Requirements, Lender shall not seek to enforce the Carry Guaranty. For avoidance of doubt, except as expressly set forth herein, Lender is not required to send any notice(s) to the Borrower Parties unless otherwise set forth in the Loan Documents.

16.    <u>Costs of Collection</u>. Borrower Parties acknowledge and agree that any and all costs, expenses, and costs of collection (including reasonable out-of-pocket attorneys' fees and expenses) heretofore or hereafter reasonably incurred by the Lender in connection with the protection and preservation of the Property and the enforcement by the Lender of its rights and remedies under the Loan Documents and/or this Agreement, including, without limitation, Lender's enforcement upon a Termination Event, and the negotiation and preparation of this Agreement, shall become part of the obligations set forth in the Loan Documents; provided, however, that any and all such costs and expenses shall be advanced by Lender as an Advance pursuant to Section 5 of this Agreement, and neither Borrower nor Guarantors shall have any obligation to fund the same.

17.    <u>Non-Interference</u>. From and after the occurrence of a Termination Event, provided Lender has not defaulted hereunder or caused a Termination Event by the Borrower and/or the Guarantors, the Borrower Parties agree not to interfere with the exercise by the Lender of any of its rights and remedies. The Borrower Parties further agree that they shall not seek to restrain

Lender's efforts or otherwise hinder, delay, or impair the Lender's efforts to realize upon any collateral granted to the Lender, or otherwise to enforce its rights and remedies pursuant to the Loan Documents except as otherwise set forth in this Agreement. The provisions of this Section shall be specifically enforceable by the Lender.

18.    Jury Trial.    The Borrower and Guarantors hereby make the following waiver knowingly, voluntarily, and intentionally, and understand that the Lender, in entering into this Agreement or making any financial accommodations to the Borrower or Guarantors, whether now or in the future, is relying on such a waiver: THE BORROWER AND GUARANTORS HEREBY IRREVOCABLY WAIVE ANY PRESENT OR FUTURE RIGHT TO A JURY IN ANY TRIAL OF ANY CASE OR CONTROVERSY IN WHICH THE LENDER BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST THE LENDER OR IN WHICH THE LENDER IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF, OR IS IN RESPECT OF, ANY RELATIONSHIP BETWEEN THE BORROWER, GUARANTORS, OR ANY OTHER PERSON, AND THE LENDER WITH RESPECT TO THE PROPERTY AND/OR THE LOAN DOCUMENTS.

19.    Governing Law.    This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York (without regard for conflicts of law).

20.    No Reinstatement.    It is expressly understood that, other than as set forth herein, Lender's execution of this Agreement and acceptance of payments in accordance herewith shall by no means be considered or construed a reinstatement or de-acceleration of the notes set forth in the Loan Documents, an extension of the Loan, or a waiver of Lender's rights or remedies at law, in equity or under the Loan Documents.

21.    Entire Agreement. This Agreement shall be binding upon the Lender, Guarantors, Borrower and their respective employees, representatives, successors, and assigns, and shall inure to the benefit of the Lender Parties. This Agreement and all documents, instruments, and agreements executed in connection herewith incorporate all of the discussions and negotiations between the Borrower, Guarantors and the Lender, either expressed or implied, concerning the matters included herein and in such other documents, instruments and agreements, any statute, custom, or usage to the contrary notwithstanding. No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof. No modification, amendment, or waiver of any provision of this Agreement, or any provision of any other document, instrument, or agreement between the Borrower, Guarantors and the Lender, shall be effective unless executed in writing by the party to be charged with such modification, amendment, or waiver, and if such party be the Lender, then by a duly authorized officer thereof.

22.    Construction of Agreement.    In connection with the interpretation of this Agreement and all other documents, instruments, and agreements incidental hereto:

a)    The captions of this Agreement are for convenience purposes only, and shall not be used in construing the intent of the Lender, Guarantors and the Borrower under this Agreement.

b)   In the event of any inconsistency between the provisions of this Agreement and any other document, instrument, or agreement entered into by and between the Lender, Guarantors and the Borrower, the provisions of this Agreement shall govern and control.

c)   Lender, Guarantors, and Borrower have prepared this Agreement and all documents, instruments, and agreements incidental hereto with the aid and assistance of their respective counsel. Accordingly, all of them shall be deemed to have been drafted by the Lender, Guarantors and the Borrower and shall not be construed against either the Lender, Guarantors or the Borrower.

23.   <u>Illegality or Unenforceability</u>.  Any determination that any provision or application of this Agreement is invalid, illegal, or unenforceable in any respect, or in any instance, shall not affect the validity, legality, or enforceability of any such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

24.   <u>Informed Execution</u>.  Each Party to this Agreement warrants and represents to the other Parties that such Party:

a)   Has read and understands all of the terms and conditions of this Agreement;

b)   Intends to be bound by the terms and conditions of this Agreement; and

c)   Is executing this Agreement freely and voluntarily, without duress, after consultation with independent counsel of its own selection.

25.   <u>Recitals</u>.  All recitals contained in this Agreement are ratified and confirmed. All defined terms set forth in the Loan Documents are adopted herein.

26.   <u>Reservation of Rights</u>. By agreeing to forbear from the exercise of those rights and remedies granted to Lender under the Loan Documents until expiration or earlier termination of the Forbearance Period, Lender does not waive any of its rights or remedies with respect to any Defaults. All rights and remedies of the Lender with respect to any Defaults are hereby preserved pending fulfillment of the Borrower's obligations under this Agreement and under the Loan Documents. The granting of the forbearance hereunder shall not, other than as expressly provided herein, be deemed a waiver of the Lender's rights and remedies or constitute a course of conduct or dealing on behalf of the Lender.  As set forth herein, only upon the occurrence of a Termination Event, Lender shall have the right to exercise one or more of its rights and remedies hereunder or pursuant to the Loan Documents including, without limitation: (a) commencement of judicial foreclosure; (b) enforcement of its rights in and to all other collateral securing the Loans, in whole or in part, including the sale thereof or other disposition as provided in the Loan Documents or applicable provisions of the Uniform Commercial Code in effect in the State of New York; (c) commencement of proceedings to enforce any of the Loan Documents; and (d) all other remedies available to Lender hereunder, pursuant to the Loan Documents or at law or in equity. Lender's agreements contained herein are limited to the express terms of this Agreement, and except as expressly set forth herein, shall not impair any right or remedy of Lender, or any of Borrower's or

Guarantors' obligations to Lender, as applicable, or Lender's right to enforce full and strict performance of all of the terms of the Loan Documents upon the occurrence of a Termination Event.

26.    Guarantors. (i) By its execution of this Agreement, Guarantors have evidenced their consent to the execution and delivery of this Agreement by Guarantors and their agreement to be bound by the terms hereof to the extent applicable. Further, Guarantors hereby: (a) ratify and confirm all obligations under the Loan Documents; (b) ratify and confirm the Guaranties; (c) agrees that the Guaranties are and shall, subject to the provisions of this Agreement, remain in full force and effect and that the terms and provisions of the Guaranties cover and pertain to the Mortgage Loan, the Mortgage Note, and the other Mortgage  Loan Documents; and (d) acknowledges that except as expressly set forth in this Agreement, there are no offsets or counterclaims of any nature whatsoever to his obligations and liabilities under the Guaranties. Guarantors further acknowledge that the execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of Lender under the Guaranties, or any other document, instrument or agreement executed and/or delivered in connection therewith.

(ii) Notwithstanding anything to the contrary in any of the Loan Documents or this Agreement, if the Borrower and/or Guarantors: (a) take any action to impede, interfere with, hinder or fail to cooperate with Mortgage Lender or its designee (including, without limitation, by failing to execute any documents reasonably requested by Mortgage Lender, including, but not limited to, the Documents of Transfer) in connection with the Conveyance and the terms set forth in Sections 6 and 7 of the Agreement; (b) fail to comply with the Conveyance Cooperation Requirements; (c) attempt to cause the Deed to be set aside as set forth in Section 7 of the Agreement; and/or (d)  take any act to stay the UCC Sale or any sale of the Collateral under the New York Uniform Commercial Code, including, but not limited to the filing by any of the Borrower Parties of any order(s) to show cause and/or any other motion or legal action seeking the stay of a UCC sale of the Collateral (the "**Full Recourse Events**"), then the Borrower and Guarantor shall be liable and obligated for the full amount of the obligations set forth in the Loan Documents and the Lender shall have full recourse against the Borrower and Guarantor for the obligations set forth in the Loan Documents. The Conditional Guaranties are hereby each amended to add the Full Recourse Events to the full recourse provisions in Section 1 thereof, and the Full Recourse Events shall become Romanette "(vii)" to the Paragraph in Section 1 beginning with "Notwithstanding anything to the contrary in the Note …".

27.    Counterparts and Electronic Copies Deemed Originals. This Agreement may be executed in counterparts, or electronic transmission, and when taken together shall constitute one single agreement. Facsimile or electronic copies of signatures shall have the same force and effect as an original.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**
**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, this Agreement has been executed as of the date first set forth above.

**MORTGAGE LENDER:**

**4452 BROADWAY 1 LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**MEZZ LENDER:**

**4452 BROADWAY 2 LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**GUARANTORS:**

_____
Amir Hasid

_____
Nir Amsel

**MORTGAGE BORROWER:**

**4452 BROADWAY MAZAL LLC,**
a Delaware limited liability company

By: _____
Name:
Title: AUTHORIZED SIGNATORY

**MEZZ BORROWER:**

**4452   BROADWAY   MAZAL
SENIOR MEZZANINE LLC,**
a Delaware limited liability company

By: _____
Name:
Title: AUTHORIZED SIGNATORY

STATE OF NEW YORK        )
                                              : ss.:
COUNTY OF  NEW YORK  )


On the  25TH  day of August, in the year 2022, before me, the undersigned personally appeared  NIR AMSEL _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ANDREA J. LAWRENCE
NOTARY PUBLIC, STATE OF NEW YORK
· Registration No. 02LA6294071
Qualified in New York County County
Commission Expires DECEMBER 16, 2025


STATE OF NEW YORK        )
                                              : ss.:
COUNTY OF  NEW YORK  )


On the  25TH  day of August, in the year 2022, before me, the undersigned personally appeared  Amir Hasid _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ANDREA J. LAWRENCE
NOTARY PUBLIC, STATE OF NEW YORK
· Registration No. 02LA6294071
Qualified in New York County County
Commission Expires DECEMBER 16, 2025


STATE OF NEW YORK        )
                                              : ss.:
COUNTY OF  NEW YORK  )


On the  25  day of August, in the year 2022, before me, the undersigned personally appeared  ERAN POLACK _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ANDREA J. LAWRENCE
NOTARY PUBLIC, STATE OF NEW YORK
· Registration No. 02LA6294071
Qualified in New York County County
Commission Expires DECEMBER 16, 2025

**EXHIBIT "A-1"**

**EXHIBIT "A-2"**

## EXHIBIT "A-3"

**EXHIBIT "A-4"**

# EXHIBIT "B-1"

## BARGAIN AND SALE DEED

**EXHIBIT B-2**

**BILL OF SALE**

## BILL OF SALE

**4452 BROADWAY MAZAL LLC,** a Delaware limited liability, having an address at address c/o HAP Investments LLC, 3 East 54th Street, 15th Floor, New York, New York 10022 ("**Seller**"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid to Seller by _____, a Delaware limited liability company having an address at 520 Madison Avenue, Suite 3501, New York, New York 10022 ("**Purchaser**"), the receipt and sufficiency of which are hereby acknowledged, hereby sells, conveys, assigns, transfers, delivers and sets over to Purchaser all fixtures, furniture, furnishings, equipment, machinery, inventory, appliances and other articles of tangible personal property owned by Seller that are located at and used or usable in connection with the real property located at: **4452 Broadway, New York, New York 10040 (Block: 2170; Lots: 62 &400)** as more fully described on Schedule A, attached hereto and made a part hereof, and all intangible personal property owned by Seller, or any Seller affiliate, related to the business of Seller in connection with said real property, including but not limited to all intellectual property, contracts, books and records and other tangible personal property.

TO HAVE AND TO HOLD unto Purchaser and its successors and assigns to its and their own use and benefit forever.

This Bill of Sale is made by Seller without recourse and without any expressed or implied representation or warranty whatsoever, except as otherwise provided in that certain Forbearance Agreement among Seller and Purchaser, dated August ____, 2022.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be delivered as of this _____ day of August, 2022

**4452 BROADWAY MAZAL LLC**

By: _____
Name: ERAN POLACK
Title: AUTHORIZED SIGNATORY

STATE OF NEW YORK                    )
                                     ) ss.:
COUNTY OF _NEW YORK_                 )

On the _29TH_ day of August, in the year 2022, before me, the undersigned, personally appeared _ERAN POLACK_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

ANDREA J. LAWRENCE
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02LA6294071
Qualified in New York County County
Commission Expires DECEMBER 16, 2025

4866-3473-1303, v. 7

## PROPERTY DESCRIPTION

**As to Block 2170 Lot 62:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly side of Broadway as legally opened and the southerly side of Fairview as vested in the City of New York;

RUNNING THENCE southerly along said easterly side of Broadway 74.51 feet to the southerly lot line of land conveyed to the City Real Estate Co. by Emil Bloch by deed recorded August in the Register of the County of N.Y. in Liber 16, Sec 8 at cp 271

THENCE easterly along the southerly line of land so conveyed as of aforesaid 100.31 feet (103.31 tax map) to a point in a line drawn parallel with the easterly side of Broadway distant 100 feet easterly therefrom measured on a line drawn at right angles thereto;

THENCE northerly parallel with the easterly side of Broadway, 85.86 feet to said southerly side of Fairview Avenue;

THENCE westerly along said southerly side of Fairview Avenue 100.29 feet to the to the point or place of BEGINNING.

**As to Block 2170 Lot 400:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City and State of New York designated on the Tax Map of the City of New York, for the Borough of Manhattan as Section 8, Block 2170, Lot 400 and bounded and described as follows:

BEGINNING at a point on the southerly side of Fairview Ave., 100.30 feet easterly from the southeasterly corner of Fairview and Broadway measured along the Southerly side of Fairview Ave.;

THENCE northeasterly along the southerly and southeasterly side of Fairview Ave. as said Avenue curves and turns, 202 feet 5-3/4 inches;

THENCE southerly on a line forming an angle on its westerly side 28 degrees 12 feet 35 inches with the last mentioned course 242 feet 6-3/4 inches to the southerly line of land formerly of the City Real Estate Co.;

THENCE westerly 103.305 feet to a point distant 100.3 feet from the easterly side of Broadway as measured along the southerly side of land formerly of City Real Estate Co.;

THENCE northerly parallel with the easterly side of Broadway, 85.86 feet to the southerly side of Fairview Ave., at the point or place of BEGINNING.

EXCEPTING and RESERVING so much of the above the premises as has been taken by the City of New York.